IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAI`I

| | |
|---|---|
| SPORTS SHINKO (USA) CO., LTD., a) Delaware corporation,<br><br>   Plaintiff,<br><br> vs.<br><br>KIAHUNA GOLF CLUB, LLC, a Hawai`i, limited liability company; KG KAUAI DEVELOPMENT, LLC, a Hawai`i limited liability company; PUKALANI GOLF CLUB, LLC, a Hawai`i limited liability company; KG MAUI DEVELOPMENT, LLC, a Hawai`i limited liability company; MILILANI GOLF CLUB, LLC, a Hawai`i limited liability company; QK HOTEL, LLC, a Hawai`i limited liability company; OR HOTEL, LLC, a Hawai`i limited liability company, and KG HOLDINGS, LLC, a Hawai`i limited liability company, FRANKLIN K. MUKAI,<br><br>   Defendants.<br><br>_____<br><br>FRANKLIN K. MUKAI,<br><br>   Third-Party Plaintiff,<br><br> vs.<br><br>SPORTS SHINKO CO., LTD., a Japan corporation, SPORTS SHINKO (HAWAII) CO., LTD., a Hawai`i corporation, SPORTS SHINKO (MILILANI) CO., LTD., a Hawai`i corporation, SPORTS SHINKO (KAUAI) CO., LTD., a Hawai`i corporation, SPORTS SHINKO (PUKALANI) CO., LTD., a Hawai`i | CIVIL NO. 04-00126 ACK/BMK<br><br>**THIRD-PARTY COUNTERCLAIM AGAINST FRANKLIN K. MUKAI, ET AL.** |

```
corporation, SPORTS SHINKO        )
RESORT HOTEL CORPORATION, a       )
Hawai`i corporation, SPORTS       )
SHINKO (WAIKIKI) CORPORATION,     )
a Hawai`i corporation and OCEAN   )
RESORT HOTEL CORPORATION, a       )
Hawai`i corporation,              )
                                  )
          Third-Party             )
          Defendants.             )
                                  )
_____ )
                                  )
SPORTS SHINKO (HAWAII) CO.,       )
LTD., a Hawai`i corporation, and  )
SPORTS SHINKO (KAUAI) CO., LTD.,  )
a Hawai`i corporation,            )
                                  )
     Third-Party Defendants/      )
     Counterclaimants,            )
                                  )
     vs.                          )
                                  )
KIAHUNA GOLF CLUB, LLC, a         )
Hawai`i, limited liability        )
company; KG KAUAI DEVELOPMENT,    )
LLC, a Hawai`i limited liability  )
company; PUKALANI GOLF CLUB,      )
LLC, a Hawai`i limited liability  )
company; KG MAUI DEVELOPMENT,     )
LLC, a Hawai`i limited liability  )
company; MILILANI GOLF CLUB,      )
LLC, a Hawai`i limited liability  )
company; QK HOTEL, LLC, a         )
Hawai`i limited liability         )
company; OR HOTEL, LLC, a         )
Hawai`i limited liability         )
company, and KG HOLDINGS, LLC,    )
a Hawai`i limited liability       )
company, FRANKLIN K. MUKAI,       )
                                  )
     Third-Party Counterclaim     )
     Defendants.                  )
                                  )
_____ )
```

**THIRD-PARTY COUNTERCLAIM AGAINST FRANKLIN K. MUKAI, ET AL.**

Third-Party Defendants SPORTS SHINKO (HAWAII) CO., LTD. and SPORTS SHINKO (KAUAI) CO., LTD. (collectively, the "SS Third-Party Counterclaimants"), by and through their attorneys, Alston Hunt Floyd & Ing, hereby allege their Third-Party Counterclaim against Franklin K. Mukai ("Mukai") *et al.* as follows:

### PARTIES

1.    Third-Party Counterclaimant Sports Shinko (Hawaii) Co., Ltd. ("SSH") is and was at all relevant times a Hawaii for profit company with its principal place of business in Hawai`i.

2.    Third-Party Counterclaimant Sports Shinko (Kauai) Co., Ltd. ("SSK") is and was at all relevant times a Hawaii for profit company with its principal place of business in Hawai`i.

3.    SSH owns and at all relevant times has owned the stock of the following subsidiaries: SSK, Sports Shinko (Mililani) Co., Ltd. ("SSM"), Sports Shinko (Pukalani) Co. Ltd. ("SSP"), and Sports Shinko Resort Hotel Corporation ("SSRHC"). SSRHC owns the stock of Ocean Resort Hotel Corp. and SSW.

4.    Defendant PUKALANI GOLF CLUB, LLC ("PGC") is a Hawai`i limited liability company, with its principal place of business in the State of Hawai`I.  The members of PGC are citizens of Hawai`i.

5.    Defendant KG MAUI DEVELOPMENT, LLC ("KGMD") is a Hawai`i limited liability company, with its principal place of business in the State of Hawai`i.  The members of KGMD are citizens of Hawai`i.

6.    Defendant MILILANI GOLF CLUB, LLC ("MGC") is a Hawai`i limited liability company, with its principal place of business in the State of Hawai`i.  The members of MGC are citizens of Hawai`i.

7.    Defendant QK HOTEL, LLC ("QK") is a Hawai`i limited liability company, with its principal place of business in the State of Hawai`i.  The members of QK are citizens of Hawai`i.

8.    Defendant OR HOTEL, LLC ("OR") is a Hawai`i limited liability company, with its principal place of business in the State of Hawai`i.  The members of OR are citizens of Hawai`i.

9.    Defendant KIAHUNA GOLF CLUB, LLC ("KGC") is a Hawai`i limited liability company with its principal place of business in the State of Hawai`i.  The members of KIAHUNA GOLF CLUB, LLC are all citizens of Hawai`i.  Defendant KG KAUAI DEVELOPMENT, LLC ("KGKD") is a Hawai`i limited liability company with its principal place of business in the State of Hawai`i.

The members of KIAHUNA GOLF CLUB, LLC are all citizens of Hawai`i. Defendants KIAHUNA GOLF CLUB, LLC and KIAHUNA GOLF CLUB, LLC are collectively referred to herein as "KG KAUAI." (Hereinafter, Defendants KGC, KGKD, PGC, KGMD, MGC, QK, and OR are collectively referred to as the "KG SUBSIDIARIES.")

10.    Defendant KG HOLDINGS, LLC ("KG HOLDINGS"), is a Hawai`i limited liability company with its principal place of business in the State of Hawai`i. The members of KG Holdings are all citizens of Hawai`i.

11.    Third-Party Plaintiff/Counterclaim Defendant FRANKLIN K. MUKAI ("MUKAI") is a citizen of Hawai`i. At all relevant times, MUKAI was an employee and/or partner of McCORRISTON MILLER MUKAI MACKINNON LLP, a Limited Liability Law Partnership ("M4"), an officer and/or director of SSH and the Third-Party Counterclaimants, and an attorney and agent for SSK. At all relevant times, MUKAI acted directly and through agents of M4.

JURISDICTION

12.    This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1332, 28 U.S.C. § 1367, and under principles of supplemental jurisdiction.

13.  Venue is appropriate in this Court under 28 U.S.C. § 1391 because most of the events giving rise to the SS Third-Party Counterclaimants' claims occurred in this district.

### GENERAL ALLEGATIONS

14.  Sports Shinko (USA) Co., Ltd. is, and at all relevant times was, a creditor of SSK.

15.  At all relevant times, SATOSHI KINOSHITA ("SATOSHI"), TAKESHI KINOSHITA ("TAKESHI") and TOSHIO KINOSHITA ("TOSHIO")(collectively, the "Kinoshitas"), and TAKUYA TSUJIMOTO ("TSUJIMOTO"), YASUO NISHIDA ("NISHIDA"), TSUGIO FUKUDA ("FUKUDA") and MUKAI (the Kinoshitas, TSUJIMOTO, NISHIDA, FUKUDA and MUKAI, are hereinafter collectively referred to as "Insiders") were officers and/or directors of SSK.

16.  In 1988, SSK acquired real and personal properties, which included the Kiahuna Golf Club and adjoining development lands (collectively, "Kaua`i Properties").

17.  Among other things, MUKAI assisted and advised SSK in managing, marketing, and selling the Kaua`i Properties.

18.  At all relevant times, SSK was insolvent, and its debt exceeded the fair market value of its assets.

### THE RCC'S ATTEMPTS TO COLLECT ON DEBT

19.  In the late 1980's and early 1990's, SSJ, (the ultimate parent corporation of SSP, SSH, SSK, SSM, SSRHC and SSW, and Plaintiff in two of the consolidated cases) established a number of overseas subsidiaries.  SSJ borrowed hundreds of

millions of dollars from Japan-based lenders.  SSJ in turn loaned those funds to its overseas subsidiaries, including SS USA, which loaned the funds to local subsidiaries, including SSK.

20.  In the late 1990's a quasi-governmental Japan entity known as the Resolution and Collection Corporation (the "RCC") received an assignment of the majority of SSJ's debt and became SSJ's major creditor.  The RCC was charged with collecting non-performing loans assigned to it.

21.  The RCC engaged SSJ in extended negotiations regarding repayment.  SSJ approached the RCC with repayment proposals that included sales proceeds of assets in Hawai`i and elsewhere, including the Kaua`i Properties.

22.  In or about May, 2000, the RCC began legal actions to collect on debt that was secured by SSJ's property and assets in Japan.  The RCC continued to make demands for repayment and SSJ continued to make repayment proposals involving Hawai`i assets.  In May 2000, SSJ (through TOSHIO) represented that the Kiahuna Golf Club was worth $5 million to RCC.

23.  In response to the RCC's actions, Toshio Kinoshita and other Insiders formulated a plan to transfer assets held by SSK and SSJ's other subsidiaries in Hawai`i outside the reach of the RCC and other creditors.  The plan entailed, among other things, transferring ownership and/or management rights over SSK's assets to third party that was to be secretly controlled by the Insiders.

**RETAINING MANAGEMENT OVER SSK**

24.  With MUKAI's assistance, in or about August, 2000, the Insiders incorporated a management company that became known as Resort Management Services (Hawai`i), Inc. ("RMS").

25.  SATOSHI provided NISHIDA, who was then an officer of SSH and certain SSH subsidiaries, and a former officer of SSK, with the funds to purchase RMS's stock.  NISHIDA ostensibly became the sole director, shareholder, and president of RMS in September, 2000.

26.  Contemporaneously, SATOSHI signed exclusive real estate brokerage listing agreements for several of SSJ's subsidiaries in Hawai`i, including the Kaua`i Properties. Pursuant to these agreements, the real estate broker (the "Broker") began to market these properties for sale.

27.  Defendant MUKAI or some acting on his behalf and under his control drafted a stock option agreement (the "Option"), pursuant to which, NISHIDA, as the sole shareholder of RMS, granted SATOSHI, TAKESHI and Toshiya Kinoshita (the sons of TOSHIO) the right to purchase all of the stock of RMS for $1,500.00.

28.  In or about October, 2000, SATOSHI, TAKESHI, and NISHIDA executed the Option.

29.  NISHIDA was only a strawman for the Kinoshitas, and he operated RMS for their benefit based upon the Option.

30.   The Insiders, including specifically MUKAI, concealed the Option and the Kinoshita's interest in RMS from the RCC, Sports Shinko's lenders and creditors, (and later, the Bankruptcy Trustee for SSJ).

31.   In or about September, 2000, the Insiders, including specifically MUKAI prepared and implemented agreements under which SSK, and other Hawai`i-based subsidiaries of SSH for which Insiders served as officers and/or directors (collectively the "Sister Companies"), to enter into management agreements with RMS (the "Management Agreements").

32.   Pursuant to the Management Agreements, RMS agreed to manage properties owned by SSK and the Sister Companies. Among other things, the Management Agreements required SSK and the Sister Companies to pay management fees, employee salaries, and other expenses to RMS, and the payment of substantial termination fees if the managed properties were transferred without RMS' consent and the transferee would not assume the Management Agreements (the "Termination Fees").   The Termination Fees totaled $3.5 million.

33.   No present and reasonably equivalent value was received by SSK or the Sister Companies in exchange for the Management Agreements.

34.   Insiders intended that these Management Contracts would impair the value of the assets of SSK and the Sister Companies, and appear to make it more difficult for their

creditors and SS-Japan's creditors to seek any recovery from those assets and/or to transfer value to the Kinoshita's through their secret control of RMS.

35.   Defendant MUKAI knew that the Management Agreements and the Option were intended to transfer assets of SSK and the Sister Companies outside the reach of their respective pre-existing creditors (including SS-USA) for the benefit of the Insiders, without any present and reasonably equivalent value passing to SSK or Contracting Companies.

**MAINTAINING OWNERSHIP OF SSK**

36.   In early 2001, the RCC threatened to put SSJ into legal reorganization proceedings in Japan.  The RCC also expressed interest in compelling SSJ to sell its overseas assets and the assets of SSJ's direct and indirect subsidiaries.

37.   In late November, 2001, TOSHIO and other Insiders created a plan to cause RMS, or another entity owned and/or controlled by the Kinoshitas, to purchase the stock or assets of SSK (the "Plan").

38.   SATOSHI informed MUKAI of the Plan.

39.   MUKAI assisted TOSHIO and the Insiders with taking steps to analyze and implement the Plan, even though they were aware that SSK was insolvent and the RCC was pursuing legal action against SSJ's assets.

40. The Insiders, including MUKAI, caused Grant Thornton, LLP to analyze the tax consequences of the transfers proposed under the Plan.

41. With the assistance of MUKAI, the Insiders marketed SSK's assets in 2000 and 2001. They received and rejected a number of offers through December, 2001.

42. In addition, MUKAI searched for buyers for the Hawai`i properties owned by SSK and the Sister Companies.

43. On December 4, 2001, SATOSHI received a letter of interest to purchase all of the assets of SSK and the Sister Companies from Defendant KG Holdings, LLC ("KG"). KG's interest was instigated by MUKAI, who had a social and professional relationship with insiders of KG.

44. After it received KG's December 4, 2001 letter, SSK, through SATOSHI, instructed the Broker to cease all marketing efforts.

45. Despite the listing Agreements, the Insiders then began exclusive dealings with KG without involving the Broker. KG's representatives flew to Japan to meet with TOSHIO and SATOSHI, among others.

46. The Insiders rejected more lucrative purchase offers provided by the Broker in order to further their plan to retain control and ownership of SSK's assets, and to hinder or delay SS-USA from being able to collect on its loans to SSK, which, in turn, would hinder SSJ's creditors, including the RCC.

47.   In early January, 2002, the RCC asked TOSHIO to voluntarily place SSJ into reorganization in Japan.  On or about January 15, 2002, TOSHIO met with RCC to discuss a plan for repayment of SSJ's debts.  The RCC rejected the repayment proposal and began steps to force SSJ into bankruptcy in Japan.

48.   On January 12, 2002, through its former Vice President Satoshi Kinoshita, DEBTOR entered into a DROA with David Resnick, *dba* Kauai Investment Partners ("Resnick") to sell the Kaua`i Properties for $10,000,000.00 (the "DROA").  The DROA was postdated to February 15, 2002.

## PURCHASE AND SALE AGREEMENT

49.   On or about January 15, 2002, SSK and Defendant KG HOLDINGS and its nominees (KG KAUAI), with the assistance of MUKAI, entered into an agreement ("PSA") to buy the assets of SSK and the Sister Companies.  The contract price was below the fair market value of the assets to be sold and substantially less than the aggregate value of competing offers from qualified buyers that the Insiders had previously rejected.

50.   On January 25, 2002, despite the DROA with Resnick, DEBTOR transferred the Kaua`i Properties to KG's nominees for $3 million.

51. The $3 million consisted of: an unsecured promissory note for $500,000, some cash, and the assumption of a mortgage held by Bank of Hawaii ("BOH")(the "Mortgage").

52. The Mortgage was cross-collateralized with other properties that certain Sports Shinko subsidiaries transferred to the KG SUBSIDIARIES.

53. The amount paid by KG Kauai was not reasonably equivalent to the DEBTOR's interest in the Kaua`i Properties at the time of the transfer.

54. At all relevant times, the Insiders (including MUKAI), KG KAUAI, and KG HOLDINGS knew or should have known that the amount to be paid by KG KAUAI for SSK's assets was significantly less than their fair market value, and that SSK would not, and did not, receive reasonably equivalent value for its assets.

55. At all relevant times, Insiders, KG KAUAI, and KG HOLDINGS each knew or reasonably should have known that SSK was insolvent.

56. By selling SSK's assets to KG KAUAI on the terms negotiated with KG HOLDINGS, the INSIDERS, with the assistance of MUKAI, realized substantially less than if they had sold to Resnick or others at arm's length. As a result, SSK received less than it should have to repay SS-USA.

57.  KG KAUAI refused to assume the Management Agreement concerning the Kaua`i Properties, thereby triggering SSK's obligation to pay the Termination Fees to RMS.

58.  On or about January 28, 2002, the RCC initiated bankruptcy proceedings against SSJ in the District Court in Osaka, Japan.

59.  On or about January 30, 2002, in partial payment of the Termination Fees, SSP, through SATOSHI, executed a deed for residential real property located at Makawao, Maui, at TMK (2) 3-2-020-034 (the "Pukalani Residence") to RMS.  SSP did not receive present and reasonably equivalent value in exchange for the transfer of the Pukalani Residence to RMS.

60.  On or about February 4, 2002, the District Court for Osaka, Japan appointed a Trustee and Deputy Trustees to manage SSJ's domestic and overseas assets.

61.  In early March, 2002, the Deputy Trustee in bankruptcy for SSJ and his assistants met in Hawai`i with SATOSHI, Mukai and others, who failed to disclose all material information about the Plan, the transactions described above, and the Insiders' efforts to prevent SSJ and its creditors from realizing the full value of SSK's assets.

62.  On January 9, 2003, the Trustee (on behalf of SS USA, DEBTOR, and other Sports Shinko entities), Resnick and his nominee, and KG Kauai together entered into a purchase and sales

agreement, under which Resnick's nominee would receive the Kaua`i Properties from KG Kauai for $9,850,000.00 (the "Resnick Sale").

63.   The Trustee and KG Kauai also agreed that: (a) the net proceeds from the sale to Resnick's nominee would be paid to BOH to reduce the Mortgage; and (b) neither the sale nor the distribution of the net proceeds to BOH would prejudice any of the claims of the Trustee or Sports Shinko.

64.   In April, 2003, the sale to Resnick's nominee (Kiahuna Fund, LLC) closed and the net proceeds were used to pay down the Mortgage.

65.   Resnick's nominee sold all but one development site of the Kaua`i Properties other than a 20 acre portion of the vacant land to another buyer for $11.5 million dollars.

### CLAIMS FOR RELIEF

#### COUNT I:  Haw. Rev. Stat. § 651C-5(a)
#### (KG HOLDINGS, KG KAUAI)

66.   The SS Third-Party Counterclaimants reallege and incorporate the allegations contained in preceding paragraphs, as though fully set forth herein.

67.   The transfer of SSK's assets to Defendants KG KAUAI was fraudulent under Haw. Rev. Stat. § 651C-5(a) because no

reasonably equivalent value was received by SSK, which was either insolvent at the time of the transfer or rendered insolvent by the transfer.

68.    As a result of the transfer and other fraudulent actions, creditors of SSK, including SSH, were damaged and SSH is entitled to damages and all other appropriate remedies authorized by Haw. Rev. Stat. § 651C-7(a) in accordance with the proof at trial.

### COUNT II:  Haw. Rev. Stat. § 651C-4
### (KG HOLDINGS, KG KAUAI)

69.    SS Third-Party Counterclaimants reallege and incorporate the allegations contained in the preceding paragraphs, as though fully set forth herein.

70.    SSK's transfer of the Kaua`i Properties to KG KAUAI was fraudulent because the transfer was made with actual intent to hinder, delay, or defraud one or more of SSK's creditors.

71.    The actual intent to hinder, delay or defraud is evidenced by, among other things, the following facts:

    a.    The transfer to KG KAUAI involved substantially all of SSK's assets;

    b.    SSK was insolvent or became insolvent as a result of the transfer;

    c.    Insiders concealed the transfer from the Broker for SSK's properties;

      d.    Insiders destroyed documents and concealed information about the transfer from SSK's successor management and the Bankruptcy Trustee for SSJ;

      e.    Insiders concealed their interest in RMS and the proceeds from the management contracts, which encumbered SSK's assets; and

      f.    The price paid for SSK's assets was below the fair market value of those assets.

72.  As a result of this fraudulent transfer, creditors of SSK, including SSH, were damaged and SSH is entitled to all other appropriate remedies authorized by Haw. Rev. Stat. § 651C-7(a) in accordance with the proof at trial.

**COUNT III:  Aiding and Abetting/Conspiracy to Violate Haw. Rev. Stat. ch. 651C (KG HOLDINGS, KG KAUAI)**

73.  The SS Third-Party Counterclaimants reallege and incorporate the allegations contained in the preceding paragraphs, as though fully set forth herein.

74.  The acts of MUKAI, KG HOLDINGS, and/or KG KAUAI caused and/or enabled the transfer of SSK's assets to KG KAUAI and an array of assets to RMS in violation of Haw. Rev. Stat. Ch. 651C.

75.  SATOSHI, TAKESHI, TOSHIYA KINOSHITA, and NISHIDA, with the help of the MUKAI and his agents, entered into

agreements to fraudulently convey assets of SSK to Insiders in violation of Haw. Rev. Stat. ch. 651C.

76. MUKAI, KG HOLDINGS, and KG KAUAI knew or should have known that the Insiders were violating and/or intending to cause SSK to violate Haw. Rev. Stat. ch. 651C. MUKAI, KG HOLDINGS, and KG KAUAI knowingly gave substantial assistance or encouragement to the Insiders in connection with their violations of  Haw. Rev. Stat. ch. 651C.

77. The Defendants' conduct injured SSK's creditors, including SSH, in an amount to be determined at trial.

### COUNT IV:  Breach of Fiduciary Duty
### (MUKAI)

78. The SS Third-Party Counterclaimants reallege and incorporate the allegations contained in the preceding paragraphs, as though fully set forth herein.

79. At all relevant times, MUKAI was an attorney, officer and/or director of the SS Third-Party Counterclaimants. Upon the insolvency of SSK, MUKAI owed fiduciary duties, including a duty of care and a duty of loyalty, to creditors of SSK, including SSH, and to the SS Third-Party Counterclaimants, to exercise his judgment in an informed, good faith effort to

maximize the value of, and sales proceeds from, SSK's assets for the benefit of SSH and SSK's other creditors, and for SSK.

80. MUKAI, alone and in concert with others, breached his duties to SSH and SSK by, *inter alia*, purposefully allowing Insiders to engage in self-dealing transactions, neglecting and abandoning corporate opportunities to obtain more value for SSK's assets for the benefit of creditors, and by conspiring to, causing, or assisting the fraudulent conveyance of SSK's assets in violation of Haw. Rev. Stat. ch. 651C.

81. SSH and SSK were proximately damaged by such breaches in an amount to be determined at trial.

## Count V:  Aiding and Abetting Breach of/ Conspiracy to Breach Fiduciary Duties
### (MUKAI, KG KAUAI, KG HOLDINGS)

82. The SS Third-Party Counterclaimants reallege and incorporate the allegations contained in the preceding paragraphs, as though fully set forth herein.

83. Upon the insolvency of SSK, the Insiders including MUKAI, owed fiduciary duties to protect the interests of SSK and the creditors and shareholders of SSK, including SSH.

84. The Insiders collaborated to prepare, execute and implement agreements that breached those fiduciary duties

whereby, *inter alia*, Insiders engaged in self-dealing transactions and fraudulently conveyed SSK's assets, and such conduct frustrated the rights of SSK and SSK's creditors and shareholders, including SSH.

85. MUKAI knew that the conduct of his fellow Insiders constituted a breach of their fiduciary duties, and gave substantial assistance and encouragement to those Insiders in such conduct.

86. MUKAI caused and/or enabled those Insiders to breach their fiduciary duties, and such acts were in furtherance of their conspiracy.

87. MUKAI, KG KAUAI, and KG HOLDINGS knew or reasonably should have known of the Insiders' fiduciary duties to SSK and SSH.

88. MUKAI, KG KAUAI and KG HOLDINGS affirmatively and knowingly agreed to aid Insiders in breaching their fiduciary duties to SSH and SSK, by assisting them in, *inter alia,* self-dealing transactions and fraudulently transferring SSK's assets. MUKAI, KG KAUAI and KG HOLDINGS knew these actions would frustrate the rights of SSK and SSK's creditors and shareholders, including SSH.

89.   MUKAI knowingly participated and provided substantial assistance and encouragement to the other Insiders in breaching their fiduciary duties.

90.   SSH and SSK were proximately damaged by such actions and omissions in an amount to be determined at trial.

### Count VI:   Deepening Insolvency
### (MUKAI)

91.   Third-Party Counterclaimants reallege and incorporate the allegations contained in the preceding paragraphs, as though fully set forth herein.

92.   MUKAI engaged in conduct that he knew would aggravate SSK's insolvency and fraudulently prolong its life, including assisting Insiders in rejecting offers to purchase the Kaua`i Properties for fair market value or greater, and in accepting the offer of KG HOLDINGS, whose offer was significantly less than fair market value and less than offers previously made by other qualified buyers.

93.   By rejecting these offers, Insiders, with the assistance of MUKAI, fraudulently prolonged the life of SSK and further deepened its insolvency.

94.  MUKAI fraudulently prolonged SSK's life in order to hinder or prevent SSH from collecting on its debt/claims and/or recovering on its investments.

95.  MUKAI's actions and omissions were performed in bad faith and/or with the intent to harm SSK's creditors.

96.  SSH was proximately damaged by such actions and omissions in an amount to be determined at trial.

### Count VII:  Attorneys' Fees (Third-Party Litigation exception) (MUKAI, KG HOLDINGS, KG KAUAI)

97.  SS Third-Party Counterclaimants reallege and incorporate the allegations contained in the paragraphs above, as though fully set forth herein.

98.  The wrongful acts of Defendants, and those acting under their direction and control, caused SSH, and SSK to incur attorneys' fees and expenses to protect their rights.

### COUNT VIII:  Rescission (KG KAUAI)

99.  Third-Party Counterclaimants reallege and incorporate the allegations contained in the preceding paragraphs, as though fully set forth herein.

100. KG KAUAI had notice of limitations of Insiders' authority to transfer the Kaua`i Properties, namely, that

Insiders owed a fiduciary duty to SSK and SSH, and were obligated to exercise judgment in an informed, good faith effort to maximize SSK's long-term wealth creating capacity.

101. KG KAUAI knew or should have known that Insiders were acting improperly by causing SSK to reject offers to purchase SSK's assets for at or above fair market value, and to accept the significantly lower offer of KG KAUAI.

102. KG KAUAI had reason to believe that Insiders were acting for their own benefit.

103. The sale of SSK's assets to KG KAUAI was suspicious on its face given the speed of the transaction and its terms.

104. Circumstances indicated Insiders were acting in fraud of SSK's creditors.

105. KG KAUAI knew or should have known that Insiders were not acting for the benefit of SSK's creditors.

106. SSH, and SSK are entitled to rescission of the transfer of the Kaua`i Properties.

## COUNT IX:  Creditor Fraud
### (MUKAI)

107. The SS Third-Party Counterclaimants reallege and incorporate the allegations contained in the preceding paragraphs, as though fully set forth herein.

108. At all relevant times, MUKAI knew or should have known SSK was either insolvent or would be rendered insolvent by the transfer of SSK's assets.

109. At all relevant times, MUKAI knew or should have known SSK was not receiving reasonably equivalent value for SSK's assets.

110. MUKAI knew SSH was a creditor of SSK and/or had claims on SSK's assets.

111. MUKAI intentionally or recklessly participated in Insiders' unlawful conduct to hinder, delay, or defraud creditors of SSK, including SSH.

112. As a result of MUKAI's acts and omissions, SSH was injured in an amount to be determined at trial.

## COUNT X:  Shareholder Claims
### (MUKAI)

113.  The SS Third-Party Counterclaimants reallege and incorporate the allegations contained in the preceding paragraphs, as though fully set forth herein.

114.  SSH is and was the sole shareholder for SSK when the Kiahuna Property was transferred KG KAUAI.

115.  At all relevant times, MUKAI and the Insiders acted on behalf of SSK.

116.  MUKAI and the Insiders caused SSK to transfer substantially all its assets to KG KAUAI for substantially less than their market value.

117.  SSK's transfer of all its income producing, valuable assets caused injury to SSH, SSK's shareholder, including without limitation, making SSK's stock worthless, causing SSK to be unable to pay dividends, and the loss of any ability to sell SSK's stock to any purchaser.

118.  As a result of MUKAI's acts and omissions, SSH was injured in an amount to be determined at trial.

## COUNT XI: Unjust Enrichment
### (Benefits Wrongly Conferred on KG Holdings and the KG SUBSIDIARIES)

119.  The SS Third-Party Counterclaimants reallege and incorporate the allegations contained in the preceding paragraphs, as though fully set forth herein.

120.  SSK and/or its shareholder, SSH are entitled to the net proceeds from the Kaua`i Properties.

121.    None of the KG SUBSIDIARIES nor KG has ever paid SSK or SSH the fair market value of the Kaua`i Properties.

122.    Neither SSK nor SSH ever received any of the net proceeds from the sale of the Kaua`i Properties to Resnick's nominee.

123.    KG and/or the KG SUBSIDIARIES have wrongfully received and retained the benefit of the net proceeds from sale of the Kaua`i Properties to the detriment of SSK and/or SSH through the reduction of the mortgage encumbering their properties.  It would be unjust to allow the KG SUBSIDIARIES and/or KG to retain the benefit of the net proceeds.

124.    The KG and/or KG SUBSIDIARIES should hold the Kaua`i Properties and the other former Sports Shinko properties to which they hold title subject to a constructive trust and a mortgage lien in favor of SSK and SSH.

125.    SSH and SSK should be equitably subrogated to the lien created by the Mortgage formerly held by BOH to the extent that any proceeds from the sale of the Kaua`i Properties were used to reduce the debt encumbering the KG SUBSIDIARIES' properties.

**Punitive Damages**
**(MUKAI, KG HOLDINGS, KG KAUAI)**

126.    The SS Third-Party Counterclaimants reallege and incorporate the allegations contained in the preceding paragraphs, as though fully set forth herein.

127.    MUKAI, KG HOLDINGS and/or KG KAUAI has knowingly, willfully, wantonly, and in reckless disregard of their civil obligations, caused, conspired to, and/or substantially assisted or encouraged the other to, fraudulent convey assets of, and harm SSJ, SSH and SSK.

128.    SSJ, SSH and SSK are each entitled to an award of punitive damages against each of these Defendants.

WHEREFORE, Third Party Counterclaimants request that the Court:

A.    Declare that: (1) SSK's transfer of the Kaua`i Properties to Defendants KG HOLDINGS and/or KG KAUAI was fraudulent as to SSK and SSH; (2) SSK (a) was the rightful owner of the Kauai Properties, and that the net proceeds from the sale of the Kauai Properties belong to SSK and/or SSH, and/or SS USA; and (b) that SSH and/or SSK is entitled to be subrogated to the

Mortgage formerly held by BOH to the extent of any excess value realized by the KG SUBSIDIARIES.

B.    Avoid the foregoing transfers to the extent necessary to satisfy SSH's claims and/or grant SSH any other relief appropriate under Haw. Rev. Stat. § 651C-7(a);

C.    Impose a constructive trust and lien on the assets of each of the KG SUBSIDIARIES to the extent that the proceeds from the sale to Resnick's nominee were used to reduce the pre-existing mortgage lien upon their properties;

D.    Order an accounting of all revenues received and expenses paid by KG HOLDINGS and/or KG KAUAI in connection with the Kaua`i Properties and the Pukalani Residence;

F.    Award SSH and SSK general, special, and punitive damages commensurate with the proof at trial; and

G.    Award SSH and SSK their attorneys' fees and costs, and such other and further relief as may be just and proper.

DATED:    Honolulu, Hawai`i, January 13, 2006.

PAUL ALSTON
GLENN T. MELCHINGER

Attorneys for Plaintiff
and Third-Party Defendants,
the SS Entities