Of Counsel:
ALSTON HUNT FLOYD & ING
Attorneys At Law
A Law Corporation

PAUL ALSTON                1126-0
GLENN T. MELCHINGER        7135-0
American Savings Bank Tower
1001 Bishop Street, 18th Floor
Honolulu, Hawai'i 96813
Telephone:  (808) 524-1800
Facsimile:  (808) 524-4591
Email:  gtm@ahfi.com

Attorneys for Plaintiffs
and Third-Party Defendants,
the SS Entities

## IN THE UNITED STATES DISTRICT COURT

### FOR THE DISTRICT OF HAWAI'I

| | |
|---|---|
| SPORTS SHINKO CO., LTD., a Japanese corporation, | CIVIL NO. CV 04-00124 ACK/BMK |
| Plaintiff, | CONSOLIDATED CASES |
| vs. | **PLAINTIFF'S AND THIRD-PARTY DEFENDANTS SPORTS SHINKO CO., LTD., SPORTS SHINKO (HAWAII) CO., LTD., SPORTS SHINKO (MILILANI) CO., LTD., SPORTS SHINKO (KAUAI) CO., LTD., SPORTS SHINKO (PUKALANI) CO., LTD., SPORTS SHINKO RESORT HOTEL CORPORATION, SPORTS SHINKO (WAIKIKI) CORPORATION AND OCEAN RESORT HOTEL CORPORATION'S MEMORANDUM IN OPPOSITION TO KG DEFENDANTS' MOTION FOR SUMMARY JUDGMENT IN CV NO. 04-00128 ACK-BMK FILED JANUARY 13, 2006; DECLARATION OF GLENN T. MELCHINGER; CERTIFICATE OF WORD COUNT; CERTIFICATE OF SERVICE** |
| QK HOTEL, LLC, a Hawai'i limited liability company, et al., | |
| Defendants, | |
| and | |
| FRANKLIN K. MUKAI, | |
| Third-Party Plaintiff, | |
| vs. | |
| SPORTS SHINKO (USA) CO.; LTD., a Delaware corporation, et al., | |
| Third-Party Defendants. | Hearing Date:  March 20, 2006 Time:           9:30 a.m. Judge:     Hon. Alan C. Kay |

601387_5 / 6850-5

```
SPORTS SHINKO (USA) CO., LTD.,  )  CIVIL NO. CV 04-00125
a Delaware corporation,         )            ACK/BMK
                                )
          Plaintiff,            )
                                )
     vs.                        )
                                )
PUKALANI GOLF CLUB, LLC, a      )
Hawai`i limited liability       )
company, et al.,                )
                                )
          Defendants,           )
                                )
     and                        )
                                )
FRANKLIN K. MUKAI,              )
                                )
          Third-Party           )
          Plaintiff,            )
                                )
     vs.                        )
                                )
SPORTS SHINKO CO., LTD.,        )
a Japan corporation, et al.,    )
                                )
          Third-Party           )
          Defendants.           )
_____)
                                )
SPORTS SHINKO (USA) CO., LTD, a )  CIVIL NO. CV 04-00126
Delaware corporation,           )            ACK/BMK
                                )
          Plaintiff,            )
                                )
     vs.                        )
                                )
KIAHUNA GOLF CLUB, LLC,         )
a Hawai`i limited liability     )
company, et al.,                )
                                )
          Defendants,           )
                                )
     and                        )
                                )
FRANKLIN K. MUKAI,              )
                                )
          Third-Party           )
          Plaintiff,            )
                                )
     vs.                        )
```

SPORTS SHINKO CO., LTD.,           )
a Japan corporation, et al.,       )
                                   )
          Third-Party              )
          Defendants.              )
_____  )
                                   )
                                   )
SPORTS SHINKO CO., LTD., a         )   CIVIL NO. CV 04-00127
Japanese corporation,             )            ACK/BMK
                                   )
          Plaintiff,               )
                                   )
     vs.                           )
                                   )
OR HOTEL, LLC, a Hawai`i           )
limited liability company,        )
et al.,                            )
                                   )
          Defendants,              )
                                   )
     and                           )
                                   )
FRANKLIN K. MUKAI,                 )
                                   )
          Third-Party              )
          Plaintiff,               )
                                   )
     vs.                           )
                                   )
SPORTS SHINKO (USA) CO., LTD.,     )
a Delaware corporation, et al.,    )
                                   )
          Third-Party              )
          Defendants.              )
_____  )
                                   )
SPORTS SHINKO (USA) CO., LTD.,     )   CIVIL NO. CV 04-00128
a Delaware corporation,            )            ACK/BMK
                                   )
          Plaintiff,               )
                                   )
     vs.                           )
                                   )
MILILANI GOLF CLUB, LLC,           )
a Hawai`i limited liability        )
company, et al.,                   )
                                   )
          Defendants,              )
                                   )
     and                           )

```
FRANKLIN K. MUKAI,                    )
                                      )
            Third-Party               )
            Plaintiff,                )
                                      )
      vs.                             )
                                      )
SPORTS SHINKO CO., LTD.,              )
a Japan corporation, et al.,         )
                                      )
            Third-Party               )
            Defendants.               )
_____)
```

**PLAINTIFF'S AND THIRD-PARTY DEFENDANTS SPORTS SHINKO CO., LTD.,
SPORTS SHINKO (HAWAII) CO., LTD., SPORTS SHINKO (MILILANI) CO.,
LTD., SPORTS SHINKO (KAUAI) CO., LTD.,
SPORTS SHINKO (PUKALANI) CO., LTD., SPORTS SHINKO RESORT HOTEL
CORPORATION, SPORTS SHINKO (WAIKIKI) CORPORATION
AND OCEAN RESORT HOTEL CORPORATION'S MEMORANDUM IN OPPOSITION
TO KG DEFENDANTS' MOTION FOR SUMMARY JUDGMENT
IN CV NO. 04-00128 ACK-BMK, FILED JANUARY 13, 2006**

Third-Party Defendants SPORTS SHINKO CO., LTD., SPORTS
SHINKO (HAWAII) CO., LTD., SPORTS SHINKO (MILILANI) CO., LTD.,
SPORTS SHINKO (KAUAI) CO., LTD., SPORTS SHINKO (PUKALANI) CO.,
LTD., SPORTS SHINKO RESORT HOTEL CORPORATION, SPORTS SHINKO
(WAIKIKI) CORPORATION, and OCEAN RESORT HOTEL CORPORATION
(collectively, the "**SS Companies**"), by and through their
attorneys, Alston Hunt Floyd & Ing, hereby oppose KG Defendants'
Motion for Summary Judgment in CV No. 04-00128 ACK-BMK filed on
January 13, 2006 (the "Motion").

I.   **INTRODUCTION**

Curiously, Defendants' Motion is almost devoid of legal
authority and based on vast oversimplifications.  It eschews
mention, discussion, and analysis of:  (1) the legal issues
critical to Defendants' arguments, as well as (2) the elements of
Plaintiff's legal claims.  The Motion does not show either that
the material facts are all undisputed or that Defendants will
prevail as a matter of law.

Specifically, this Motion must be denied because:

1.    Toshio Kinoshita's ("Toshio's") knowledge may not be imputed to the Sports Shinko ("SS") companies under Hawai`i law.

2.    The right to pursue Uniform Fraudulent Transfer Act ("UFTA") claims is not restricted to "arms length" creditors.

3.    The transferor/debtor SS companies are not necessary parties to these lawsuits.

4.    Toshio's alleged status as "insider" to the SS companies is irrelevant to the creditor-transferor relationship.

5.    Even if the imputation of wrongdoing doctrine applies, there are genuine issues of material fact about its application that must be resolved at trial.

6.    The SS Companies were, and are, entitled to be treated as separate entities until Defendants prove otherwise, and they have not done so with this Motion.  And,

7.    What really happened is that Toshio's intent to scuttle his own companies to thwart his creditors gave Defendants a sweetheart deal that damaged the SS Companies.

## II.    FACTUAL BACKGROUND

Toshio Kinoshita formed Sports Shinko Co., Ltd. ("SS-Japan") and began business in Japan operating resort properties. Toshio was SS-Japan's President and Director, stewarding and steering SS-Japan in its growth.  Beginning in 1985, during Japan's "bubble economy", SS-Japan borrowed hundreds of millions of dollars from Japan lenders and acquired resort properties in Florida, California, Hawai`i, Germany, and France through locally

established subsidiaries.  SS-Japan relied on attorney Frank
Mukai ("Mukai"), to structure property acquisitions in Hawai`i.
Mukai later became a director in the Hawaii-based subsidiaries
that he incorporated for SS.

###### A.    Structuring Intercompany Loans and Subsidiaries.

For much of the period during which SS-Japan's Japan
lenders were lending funds to SS-Japan, Japan law imposed
regulatory constraints that severely complicated direct lending
to overseas entities, or taking security interests in property
outside of Japan.  Decl. of Tsugio Fukuda ("Fukuda Decl.") at ¶¶
13-15.  Thus, the Japan lenders lent funds to SS-Japan, and SS-
Japan, in turn, loaned the funds to its subsidiaries.  Fukuda
Decl. at ¶ 11.  However, the Japan lenders did not need to obtain
mortgages on overseas property because they could directly sue
SS-Japan's subsidiaries under Japan law.  *See UFJ Bank Limited v.
Ieda*, 109 Hawai`i 137, 139-140 & n.6, 2005 Haw. LEXIS 608 at *5,
*6 & n.6 (Dec. 8, 2005).

The SS intercompany loans were made for various
business purposes, including tax purposes, *e.g.* so that funds
could be paid back to the SS-Japan without adverse tax
consequences.  Fukuda Decl. at ¶¶ 12, 16-18.

###### B.    Due To A Financial Crisis, SS Marketed its Properties.

By January, 2000, SS-Japan was in severe financial
trouble and having difficulty with its Japan lenders; SS-Japan
was having problems even servicing its debt.  Fukuda Decl. at ¶
21.  A majority of SS-Japan's debt had been assigned to the

Resolution and Collection Corporation ("RCC"), a quasi-governmental entity assigned the task of cleaning up Japan's savings and loan crisis. *Id.* The RCC and SS-Japan's other Japan lenders threatened to institute reorganization proceedings against SS-Japan. *Id.* SS-Japan was negotiating to repay its loans by selling SS's overseas assets, which SS-Japan represented to its Japan lenders were worth substantially more than the price Defendants paid. Ex. "1"; *see also chart below* at p. 10.

In late, 2000, SS Hawaii's subsidiaries entered *exclusive* listing agreements for most of their Hawai`i assets with Colliers Monroe Friedlander ("CMF"). Ex. "2".

### C. SS's New Management Agreements and Option Contract.

Just before listing their properties, in August, 2000, SS's various Hawai`i subsidiaries entered 20 year property management agreements for the hotels and golf courses. Ex. "3". The new manager was Resort Management Services (Hawaii), Inc. ("RMS"), a company owned and run by Mr. Yasuo Nishida. *Id.* Mr. Nishida was no stranger to SS; he was Toshio Kinoshita's former personal secretary, and had served as an officer of several SS Hawaii subsidiaries. *Id.; See* Defs'. Exs. "K" - "M".

Under these RMS Management Agreements, if the SS Hawaii properties were sold and the purchasers did not assume the Management Agreements, the SS Companies were required to pay a total of $3.5 million in "termination fees" to RMS. Ex "4". The Kinoshita's purpose in establishing the RMS Management Agreements

with Mr. Mukai's help was to hinder or delay SS-Japan's Japan lenders from attaching SS Hawaii's properties.  Ex. "5".

The sons of Toshio Kinoshita also obtained from Mr. Nishida (RMS's sole shareholder, president and director) a ten year Option Agreement that entitled them to buy all the stock of RMS for only $1,500.00 (the "Option").  Ex. "6".  Mr. Mukai advised the Kinoshitas that the Option should not be exercised when the situation with the Japan lenders and RCC had "settled down."  Ex. "7".  Mukai was aware of a possible SS bankruptcy and warned SS-Japan about the potential for challenges to the management companies as preferential or fraudulent transfers in the event of a bankruptcy.  Ex. "8".

**D.   SS-Hawaii Ignored Cash Offers Made After September 11, 2001 That Were Substantially Higher Than the Amounts Defendants Paid.**

By late 2001, CMF had brought in several cash offers. Even though CMF was not marketing the Mililani property, CMF received an offer which sought an option to purchase Mililani golf course for $8 million.  Ex. "9".

After September 11, 2001, CMF brought SS-Pukalani an $11.5 million cash offer for *all* of its Maui property, *including* the Maui Sewage Treatment Plant (the "STP"), the Pukalani Country Club, and the Maui development lands.  Ex. "11".  CMF brought another $7.5 million cash offer to close on the STP and the

Pukalani properties immediately with *no* due diligence.  Ex. "12"[1]

The chart below shows certain offers on the SS Hawaii

subsidiaries' property brought by CMF in contrast to the

allocated price Defendants paid and SS-Japan's representations of

value to the RCC.

| *SS Property* | *CMF/Offer Price (late 2001)* | *Value SS-Japan represented to RCC (5/18/01)  Ex. "7"* | *Defendants' Price (1/25/02) E* |
|---|---|---|---|
| *Kiahuna Golf Club & development lands* | $10 M (Resnick) Ex. "10" at 0081384. | $5 M | $3 M |
| *Pukalani Country Club, development lands, and Sewage Treatment Plant* | $11.5 M (Smith) Ex. "11" at 104 3276 | $9 M | $4.5 M + $10.00 for STP stock |
| *Mililani Golf Course* | $8M (Allred) (option) Ex. 9 at 083 1541. | *n/a* | $5.5 M |
| *Ocean Resort Hotel Waikiki* | $21 M (for lease and fee) Ex. 13 at 104 3263. | $14 M | $4.5 M |
| *Queen Kapiolani Hotel* | $4 M.  Ex. 14. | *n/a* | $3 M |

*See.* Exs. "9" – "16".

    **E.    Toshio Requests Mukai's Help to "Protect" the SS Properties in Hawaii-to "Hinder, Delay, and Defraud" SS's Creditors.**

    Inexplicably, SS ignored these higher cash offers.

Rather than maximize the value of the SS Group's properties in

---

    [1] Despite Defendants' claims of the STP's dire circumstances since 2002, the STP has not failed in the past four years. Melchinger Decl. at ¶.

Hawai`i, Toshio instituted a "plan" to "protect" the properties from the Japan lenders.  Ex. "17"

Prior to the RCC's filing its petition to place SS-Japan in involuntary reorganization on January, 28 2002, the RCC told SS-Japan that it planned to file the petition in January, 2002.  Fukuda Decl. at ¶ 23.  Toshio held a meeting of the directors and informed them of the RCC's plan.  *Id.*  Immediately before the transfers, Mr. Mukai, whose firm was handling the transfers of SS Hawaii subsidiaries' properties, asked Toshio for permission to resign as director from the SS Hawaii subsidiaries so that the properties could be sold "in a clean fashion."  Ex. "20."

In late November, 2001, SS-Japan was in a "real pinch" financially.  Ex. "4".  Satoshi requested Mukai's help to implement Toshio's plan to "protect" the Hawaii properties from the Japan lenders and the RCC.  Ex. "17".  Mukai asked SS's CPAs, Grant Thornton ("GT"), to investigate the tax consequences if SS transferred all of its Hawai`i properties to RMS or other entities.  Ex. "18".  At some point in late December or early November, Mukai introduced SS to Defendants.  Ex. "19".

**F.    The Defendants Express Interest in SS's Hawai`i Properties.**

On December 4, 2001, Defendants expressed an interest in purchasing the SS Hawai`i properties.  Ex. "21".  On December 4, 2001, Satoshi instructed CMF to stop marketing the SS properties.  Ex. "22".  On December 6, 2001, Mukai's law firm

started drafting a purchase and sale agreement for *all* the assets
of SS-Hawaii, structured as a sale of the stock of Sports Shinko
(Hawaii) Co., Ltd.  Ex. "23".

**G.    The Defendants' Offer To Buy SS's Hawai`i Properties.**

On December 11, 2001, Defendants sent SS-Hawaii an
offer to buy all of its properties for $22 million.  Ex. "24".
In mid-December, 2001, Defendants' representative, Wayne
Tanigawa, flew to Japan to meet with Toshio and Satoshi Kinoshita
(Vice President of the SS-Hawaii entities) regarding the sale of
SS Hawaii subsidiaries' assets.  Ex. "19".  It appears that no
other SS-Japan or SS USA officers or employees were included in
these discussions with Defendants, including Mr. Fukuda, even
though Mr. Fukuda was charged with all aspects of SS's overseas
operations and transfers of overseas properties.  Fukuda Decl. at
¶¶ 6-9, & 22.

**H.    The Defendants' Sweetheart Deal with the SS-Hawaii
       Subsidiaries.**

On January 15, 2002, only three days after Vice
President Satoshi Kinoshita signed a DROA with to sell SS's Kauai
property for $10 million in cash, Ex. "25", Defendant KG Holdings
and the SS-Hawaii subsidiaries executed a purchase and sale
agreement ("PSA").  Ex. "26".  Under the PSA, the SS Hawaii
subsidiaries agreed to transfer substantially all their
properties to Defendants' affiliates.  In exchange, Defendants
agreed to: (1) pay approximately $2 million dollars in cash; (2)
assume a mortgage held by Bank of Hawaii ("BOH") with a balance

601387_5 / 6850-5                    -8-

of about $10.6 million (SS-Japan remained as guarantor); and (3)

give the transferor SS entities a total of $9 million in

*unsecured* notes.[2]  *See* Defs'. Ex. "T" (at A12509); Ex. "26" &

"27".

The transfers of the SS properties involved five

separate closings.  Each transfer involved separate deeds,

escrows, closing statements, bulk transfer reports, conveyance

tax certificates, and separate prices were set for each of the

entities' properties.  *See* Exs. "28" – "29".

**I.   SS Accelerates the Closing Date for the Transfers to Defendants to the Business Day Before the SS Bankruptcy Is Filed.**

The transfers to Defendants were originally scheduled

to close on January 28, 2002, just 13 days after the PSA was

signed.  *See* Ex. "30".  However, the Kinoshitas accelerated the

closing date to January 25, 2002.  *Id.*  Satoshi said he could not

"secure any event" in Japan on January 28, 2002.  *Id.*  By this

time, of course, Toshio and SS's directors had been informed of

the time frame within which the RCC would file to place SS-Japan

in reorganization.  Fukuda Decl. at ¶ 23.

On January 28, 2002, the RCC filed pleadings to start

the involuntary reorganization of SS-Japan.  Fukuda Decl. at ¶

23.  Under recent amendments to Japan's corporate reorganization

---

[2] In mid January, 2001, BOH reviewed the risk involved in
Defendants' assumption of its mortgage and valued three of the
five SS Hawaii properties at $34 million.  Ex. "15" at 009 0725.
BOH believed Defendants were getting an "excellent buy."  *Id.*  In
contrast, Defendants paid only $14.5 million for the same three
properties.  *See* Defs'. Ex. "T" (at A12509).

law, the bankruptcy estate of SS-Japan included, and the Trustee
had authority over, overseas assets.  Ex. "31" at ¶¶ 4-6.

Immediately after RCC's filing, Vice President Satoshi
transferred a Maui residence worth over $400,000 to RMS in
partial satisfaction of the termination fees allegedly due under
one of the RMS management agreements.

In sum, a short chronology of the KG/SS transfers is as
follows:

> **1/12/02:** Satoshi signs DROA with David Resnick
> ("Resnick") to sell SS's Kiahuna Golf Course
> and development lands ("Kauai Property") for
> $10 million in cash.  Ex. "25".
>
> **1/15/02:** Satoshi signs a purchase and sale
> agreement on behalf of the SS Hawaii
> subsidiaries to transfer substantially all SS-
> Hawaii's property to Defendants, including the
> Kauai property for only $3 million.  Ex. "26".
> The SS-Hawaii entities agree to *finance*
> Defendants' purchase with *unsecured* notes.
> Because the RMS Management Agreements are not
> assumed, this deal triggers millions of dollars
> in alleged liabilities.
>
> **1/15/02:**   Closing date is accelerated from
> 1/28/2002 to 1/25/2002 due to Satoshi's and
> Toshio's request.  Ex. "30".
>
> **1/25/02:** Defendants conclude the short "due
> diligence" period and close on three golf
> course properties and development lands.  Ex.
> "26" at 003 0609, ¶¶ 3.1 & 6.3.
>
> **1/27/02 (1/28/02, Japan time):** the RCC files a
> petition to start involuntary reorganization

proceedings for SS-Japan in the Osaka District Court.   Fukuda Decl. at ¶ 23.

**1/29/02:** Resnick's company sues Satoshi and Sports Shinko (Kauai) in the U.S. District Court for the District of Hawaii, Civil No. CV 02-0062 SK/BMK. Ex. "32" (Complaint).

**1/30/02:**  Satoshi deeds Maui residential property to RMS in partial payment of the RMS Management Agreement termination fees.  Ex. "33".

**2/04/02:** The Osaka District Court appoints an interim for SS-Japan. (*See* Stipulation in lieu of exhibits with Defendants, yet to be entered).

These transfers to Defendants were highly suspect on their face.  There was virtually no due diligence period, considering the complexity of acquiring five resort properties and development lands.  Closing was accelerated to the business day before SS-Japan's bankruptcy.  The transfers were seller financed, for unsecured notes, and for little cash.  They occurred despite existing higher cash offers (even after September 11).

## III. LEGAL STANDARD

On a motion for summary judgment, the Court must view the facts and draw all inferences in the light most favorable to the nonmoving party.  *Dominguez-Curry v. Nev. Transp. Dep't*, 424 F.3d 1027, 1035 (9th Cir. 2005).  Further, the moving party must

show its right to judgment *as a matter of law*.  F.R.C.P. Rule
56(c).

## IV.  ARGUMENT

Defendants' Motion is grounded on its view that "a
person cannot defraud himself."  Mtn. at 3 & 26.  From that
simplistic premise, Defendants proceed to conclude without the
benefit of proof, legal authority, or analysis that: (1)
President Toshio Kinoshita's knowledge of his attempt to scuttle
the SS group and take away assets from SS and SS's creditors must
be imputed to all the SS Companies; and (2) all the SS Companies
are the same and/or their corporate form should be ignored.  In
making these arguments, Defendants neither validate their view of
the law, nor their self-serving view of the facts.

### A.    Toshio's Knowledge May Not Be Imputed to the SS Companies Under Hawai`i Law.

Defendants fail to *expressly* analyze or adequately
brief the imputation principle that is crucial to their Motion.
Hawai`i law governs the controlling question as to when an
agent's knowledge is imputed to his principal.  *FDIC v. O'Melveny
& Myers*, 61 F.3d 17, 18 (9th Cir. 1995)(noting *Erie RR v.
Tompkins* mandates State law apply to the law of
imputation)(refusing to impute principals' perfidy to receiver).

Under Hawai`i law, the knowledge of an agent whose
interests are adverse or antagonistic to a principal will **not** be
imputed to a corporation.  *Henry Waterhouse Trust Co. v. Home
Ins. Co.*, 27 Haw. 572, 579 (1923).

> Ordinarily a corporation is chargeable with any facts which are known to its agents, but **in transactions of a dishonest character between co-employees, where one participates in the perpetration of a fraud upon the corporation for the benefit of the other, the law does not infer that the agent will communicate the facts to the corporation, and under such circumstances the corporation is not bound.**

*Henry Waterhouse Trust Co. v. Home Ins. Co.*, 27 Haw. 572, 580 (Haw. 1923)(internal quotations omitted; emphasis added). *See also, Employees Ret. Sys. v. Real Estate Fin. Corp.*, 71 Haw. 392, 401, 793 P.2d 170, 174 (1990).

Toshio and others damaged *both* the transferor SS Companies *and* the Plaintiffs by selling substantially all SS's Hawai`i properties to a buyer introduced by Mukai, the SS Companies' director and attorney. *See* Defs'. Exs "I" – "M" & "P". Their actions caused direct harm to the SS Companies and diminished their value.

Defendants offer *no* legal argument and *no* authority that mandates that this Court impute either Toshio's knowledge or the knowledge any other former directors or officers to the SS Companies in this context.[3] Thus, there is no basis for finding the imputation defense applies in this case.

---

[3] The only assertion that Defendants appear to make in support of their presumption that the SS Companies must be charged with the knowledge of Toshio Kinoshita is to state that were "no 'innocent shareholders' of [SS-USA], as they were, like [SSM], controlled by Toshio." Mtn. at 9, n.12. This fact is irrelevant to whether knowledge of an officer's or director's defalcation is imputed to a company. The legal significance of this statement is not explained by any case law or authority. Defendants offer no authority that a shareholder's knowledge must be imputed to a company under Hawai`i law.

Specifically, Defendants have produced no authority that supports summary judgment where:

(1)  Assets are sold at firesale prices just before the RCC filed its petition to place SS-Japan into reorganization proceedings and an innocent interim administrator for SS-Japan was placed in control of SS-Japan and its assets;

(2)  Beneficial ownership of the SS Companies was taken from the hands of the Kinoshita family and Toshio in February, 2002, immediately after the subject transfers; and

(4)  Mr. Fukuda, a director of Plaintiff and the head of the SS International Business Division charged with managing all aspects of SS's overseas properties, was excluded from meetings with Defendants and Toshio and Satoshi dealt with most of the transfers alone.

The fact that the transactions were hastily crafted and concluded just before the Plaintiff Companies were wrested from the Kinoshita's control precludes imputation of their misconduct i this case.  *See F.D.I.C v. O'Melveny & Myers*, 61 F.3d 17, 19 (9th Cir. 1995)("While a party may itself be denied a right or defense on account of its misdeeds, there is little reason to impose the same punishment on a trustee, receiver, or similar innocent entity that steps into the party's shoes pursuant to court order or operation of law."); Fukuda Decl. at ¶ 22.

**B.  Even If the Imputation Doctrine Applies, There Are Genuine Issues of Material Fact About Its Application That must Be Resolved at Trial.**

Even if the Court were to find that the imputation doctrine somehow applied in this case under Hawai`i law, the application of the imputation defense requires the Court to evaluate the credibility of witnesses and, as such, requires a

jury.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249-250

(1986).[4]  Summary judgment cannot be granted where the evidence

supporting Defendant's factual claims requires the fact finder to

resolve factual disputes at trial, if those disputes may

reasonably be resolved in favor of either party.  Here, the

disputed issues include, at minimum:

1.  Whether the sales to Defendants were made with the actual intent to hinder, delay or defraud (which implicates all of the issues identified in Haw. Rev. Stat. § 651(c)-4(b) regarding intent);

2.  Whether the transactions produced fair (*i.e.*, reasonably equivalent) value to the Plaintiff companies;

3.  Whether the transferor companies were, or became, insolvent as a result of the transfers;

4.  Whether the interests of management at the time of the transfers conflicted with the interest of the companies creditors;

5.  Whether the transfers were consistent with the fiduciary duties owed by management to creditors;

6.  What the transferees knew or should have known about the intent of the transferors' to thwart the RCC's efforts to initiate bankruptcy proceedings and oust the Kinoshitas from control of the SS Companies for the benefit of creditors

*See also* Section E below, at 24-27.

    **C.**    **The SS Companies Were, and Are, Entitled To Be Treated As Separate Entities Until Defendants Prove Otherwise, and They Have Not Done So With This Motion.**

---

[4] Also, "where an issue as to a material fact cannot be resolved without observation of the demeanor of witnesses in order to evaluate their credibility, summary judgment is not appropriate."  Fed. R. Civ. Pr. 56, advisory committee notes (1963).

Defendants' Motion discusses piercing the corporate veil and "alter ego" theories as part of a vague argument that Plaintiff's claims are somehow not "properly pled" and that Plaintiffs are the wrong party to bring this action. Mtn. at 21-23 & n.25. In support of this argument, Defendants cite only *Robert's Hawaii School Bus, Inc. v. Laupahoehoe Trans.* Co., 91 Hawai`i 224, 242-243, 982 P.2d 853, 871-873 (1999). Mtn. at 22, n.25.

Defendants fail to explain why *Roberts* supports summary judgment in their favor. It does not. *Roberts Hawaii* notes that Hawaii Courts are reluctant to disregard the corporate entity, and lists a large number of factors that bear upon whether a corporate entity is an "alter ego." *Id.* & n.12. Defendants have not provided any proof of the vast majority of the factors listed in *Robert's Hawaii*. Further, Defendants provide no facts supporting their *implied* argument that recognizing the corporate form of the SS Companies somehow works an injustice against them. *See id.* at 242, 982 P.2d at 872. At best, the Defendants establish only direct and indirect ownership and the *authority* to control the SS Companies, which is insufficient.[5]

---

[5] At most, Defendants have shown Toshio could have controlled, or had the authority to control the affairs of the SS Companies as (indirect) owner and officer. Ownership is insufficient, and not dispositive of whether a corporation is an *alter ego*. *Roberts Hawaii School Bus v. Laupahoehoe*, 91 Hawai`i 224, 243, 982 P.2d 853, 873 (1999); *Henry Waterhouse Trust Co.*, 27 Haw. at 582. Even if Defendants were to establish that the SS Companies were "*alter egos*" of Toshio, Defendants provide no authority that supports the conclusion that summary judgment is justified in their favor.

SS is not trying to pierce its subsidiaries' corporate veils. If Defendants wish to pierce those corporate veils or have all the SS entities deemed to be Toshio's *alter egos* for the purposes of these proceedings, they bear the burden of establishing those matters, overcoming the presumption against, disregarding the corporate form. *See Henry Waterhouse Trust*, 27 Haw. at 581; Roberts, 91 Hawai`i at 241 n.12, 982 P.2d at 870.

And even if Defendants somehow establish that Toshio treated the SS Companies as *alter egos* for the purposes of these transactions, there are genuine issues of material fact in dispute. Defendants contend that Toshio controlled all the companies. The issues that remain are Toshio's actual *actions* (as opposed to his authority to take action) and the *reasons* for Toshio's ignoring other offers and damaging the SS Companies by steering the SS Group "onto the rocks" and underpricing company assets that Toshio was required to preserve for SS-Japan's creditors, given his knowledge of the impending reorganization proceeding. *See, e.g., Production Resources Group,* 863 A.2d at 788. Fukuda Decl. at ¶ 23.

---

Indeed, Defendants admit that the Defendant LLCs are *all* under common ownership and controlled by common officers. Mtn. at 2, n.1. Defendants corporate family structure is similar to the SS Companies: sister affiliates, with funds advanced by a parent holding company in exchange for unsecured promissory notes. Ex. "26" at Par. 2.2(b). This alone is obviously not fraudulent. Defendants conflate, without any analysis or legal authority, the issues of: (1) Toshio's fraud upon, and attempt to scuttle the SS entities, and (2) the SS Companies' inter-relationships.

Defendants' implied contention that retoring the former assets to the SS Companies would work an injustice is wrong.

**D.   The Transferor/Debtor SS Companies Are Not Necessary Parties to these Lawsuits.**

Defendants argue that the Plaintiffs should have sued their sister entities, and that the failure to join them implies that there was no "arm's length" transaction.  Mtn. at 3-4, 21, & n.6.  For this argument, Defendants rely on *U.S. v. Noble*, 1999 U.S. Dist. LEXIS 9821 (W.D. Mich.).  Mtn. at 4, n.6.  *Noble* does not rule this issue in Hawai`i and Defendants are incorrect.

Defendants' argument fails for several reasons:

1.   Hawai`i law requires only the transferee as a necessary party to a Uniform Fraudulent Transfer Act ("UFTA") claim.  *Tanaka v. Nagata*, 76 Haw. 32, 36, 868 P.2d 450, 454 (1994).

2.   The citation to *Noble* is based on dicta; the cases cited in *Noble* for the proposition that transferor-debtors are necessary parties do not support Defendants' argument.  Specifically, *Keaton v. Little*, 43 F.2d 396 (10th Cir. 1929)(cited at *Noble*, 1999 U.S. Dist. LEXIS 9821, *6), expressly holds that when the debtor has sold the property and retains no interest, as here, it is not a necessary party.  *Id.* at 397.  *Allan v. Moline Plow Co.*, 14 F.2d 912 (8th Cir. 1926), also provides that when the debtor has no assets and the creditor's claim is admitted, as here, it is not a necessary party.  *Id.* at 915.  *Keene v. Hale-Halsell Co.* expressly states the debtor need

not be a party to attack a fraudulent transfer.  118 F.2d 332,

334 (5ᵗʰ Cir. 1940).  The Hawai`i SS Companies have lost title to

the properties because they were all transferred to Defendants on

the eve of the SS-Japan bankruptcy, and suit against the Hawai`i

SS subsidiaries is futile and unnecessary.[6]

   3. The transferor-debtors are now all parties to this

litigation as a result of Mr. Mukai's third-party complaints.

   4. The Trustee was obligated to conserve corporate

assets and maximize the bankruptcy estate; he could not waste

assets by causing one SS entity to sue another SS debtor entity

that he controlled through the Japan reorganization proceedings.

Ex. "31" at ¶ 5.

   Defendants' argument that the Plaintiffs "must" sue the

SS Debtor/transferors, or that the present suit is somehow

procedurally flawed, is moot, legally incorrect, and flies in the

face of logic.

  **E.** **The Right to Pursue Uniform Fraudulent Transfer Act**
    **("UFTA") Claims Is Not Restricted to "Arms Length"**
    **Creditors.**

   Defendants contend that the UFTA's application is

restricted to protecting creditors in "arm's length" loan

transactions.  Mtn. at 17-19.  This is Defendants' own

interpretation of the UFTA, unguided by any legal authority.

Rather than legal authority, Defendants create a fiction—an

---

   [6] The Debtor entities will stipulate as to the validity of
the intercompany debts if the court finds that the undisputed
existence of these debts is a prerequisite to this action
proceeding.

extended hypothetical story about "White Co." and "Black Co."
Mtn. at 17-19. That hypothetical is not fact or law; it does not
support the Motion. Further, the Defendants' oversimplified
"White Co./Black Co." hypothetical ignores: (1) the language of
HRS ch. 651C; (2) the issues of Japan law and business reasons
for the SS intercompany loans; and (3) all the documents that
have been made available to Defendants that establish the
intercompany loans as valid obligations. Defendants have not
raised or briefed any of these issues in their Motion.

     The plain language of the UFTA (HRS ch. 651C) merely
requires a "claim" in order for one to be a "creditor." If the
UFTA did not apply to intercompany debt or to debts owed to
shareholder/lenders, the UFTA would state that limitation. It
does not. In fact, the UFTA's language defining "claim" is
expansive, and not limited to "arm's length" transactions.[7]

     Further, the SS intercompany loans *were* "arm's length"
in that Japan lenders at the time were constrained in terms of
their overseas lending, and they loaned the money for acquisition
of property overseas by lending it to SS-Japan. Fukuda Decl. at
¶¶ 13 & 14. Specifically, the lenders faced restrictions and
regulation under the Foreign Exchange and Foreign Trade Control
Act. *Id.*; Ex. "34". FEFTCA transl. Therefore, the intercompany

---

    [7] ""Claim" means a right to payment, whether or not the
right is reduced to judgment, liquidated, unliquidated, fixed,
contingent, matured, unmatured, disputed, undisputed, legal,
equitable, secured, or unsecured." Haw. Rev. Stat. § 651C-1.
From this broad language, it would seem that even a shareholder's
equity interests qualify as "claims."

loans were extensions of the Japan lenders' rights against the SS-Hawai`i subsidiaries.

SS's intercompany loans were essentially interchangeable with the loans SS-Japan and its subsidiaries received from its Japan lenders. For example, the Long Term Credit Bank of Japan ("LTCB") closed out a loan that a U.S. LTCB branch had made directly to Sports Shinko (Florida), Co. Ltd. ("SS-Fla."), which was secured by a mortgage on Florida property. Fukuda Decl. at ¶ 14. LTCB did this by having a Japan bank branch loan to SS-Japan an amount sufficient for payoff of the SS-Fla. loan. *Id.* SS-Japan then loaned the LTCB loan proceeds down a chain of subsidiaries back to SS-Florida, which in turn paid off the LTCB branch loan to LTCB's U.S. branch. *Id.* The end result is that LTCB converted its secured, direct loan to an SS subsidiary into intercorporate debt so it could close its U.S. branch.

In addition, under Japan law the Japan lenders had the "right of subrogation with respect to [any] 'Inter-Company Debt," pursuant to Article 423 of the Japan Civil Code, which provides a right of subrogation." *See UFJ Bank Limited*, 109 Hawai`i at 139-140 n.6., 2005 Haw. LEXIS 608 at *5, *6 & n.6; Ex. "35" (transl. Art. 423).

These factors mean that the SS intercompany loans gave the Japan lenders direct causes of action against the SS Companies in Hawai`i under Japan law. SS-Japan's lenders' were essentially the third party beneficiaries of the intercompany

loans.    Defendants have provided no evidence or law that supports

any conclusion that the SS intercompany loans were anything but

valid loans.

The Motion does not brief or raise the nature of the SS

intercompany loans or their significance under Japan law, or the

duties that Toshio had to maximize the assets of the SS Group for

the SS Group and its creditors.    These are factual issues that

must be developed at trial.

Defendants also completely ignore the undisputed fact

that SS-Japan had many outside creditors (the RCC alone held many

millions of dollars in claims), and that when a company is in a

"zone of insolvency," the management has a special fiduciary duty

to preserve and maximize the value of the corporation's assets to

satisfy the legitimate claims of its creditors.    *See, e.g.,*

*Production Resources Group, LLC v. NCT Group, Inc.*, 863 A.2d 772,

788 (Del. Ch. 2004).    Here, the management and Mukai knew of the

financial crisis of SS-Japan and its subsidiaries.    RCC had told

SS-Japan it would take legal action and of its plan to place SS-

Japan in reorganization proceedings.    Fukuda Decl. at ¶ 23.    As

early as August, 2000, Mukai had warned SS-Japan of the dangers

of a bankruptcy trustee who might challenge SS transfers and was

assisting SS-Japan to "hinder, delay or defraud" the RCC by

putting up management agreements as barriers to suing to recover

the SS Hawaii subsidiaries' properties.    Ex. "5".

When the corporation enters a "zone of insolvency,"

Directors and officers owe fiduciary duties to creditors-not

shreholders-to maximize the value of the corporation.[8]  Thus,
Toshio, his sons, Mukai and others all had a duty to maximize the
value of the SS Group's assets.  Instead, they damaged the SS
Companies through fire sale transfers to Defendants, and in turn,
caused the creditors real harm.  The SS Companies have the right
to recover their properties from Defendants, which were
transferred through Toshio's defalcations.  Based on its plain
language, the UFTA exists to undo this type of fraudulent
transfer.  Defendants contentions to the contrary are frivolous.

**F.    Toshio's Alleged Status as "Insider" to the SS
       Companies Is Irrelevant to the Creditor-Transferor
       Relationship.**

Defendants argue that Toshio is an "insider," and that,
the SS intercompany loans were, for some reason, not "arm's
length."[9]  Mtn. at 20.  This is yet another vague argument from
Defendants with no case law provided for support.

The "insider" designation under the UFTA has nothing to
do with the creditor's "claims" against the *transferor*, which
serve as a predicate for the claims against the transferee.  The

---

[8] Of course, a company's management's duty to maximize
company assets in the "zone of insolvency" is merely a change in
the beneficiaries of a director's or officers' duty to his
corporation of "undivided, unselfish and unqualified loyalty,
unceasing effort never to profit personally at [the
corporation's] expense, and unbending disavowal of any
opportunity which would permit the [agent's] private interest to
clash with those of his [corporation]."  *Lussier v. Mau-Van
Develpment, Inc.*, 4 Haw. App. 359, 381, 667 P.2d 804, 819-20
(1983).

[9] Defendants do not define "arm's length" or offer any cases
to justify their views about the legal significance of this term
as to Plaintiffs' claims.

UFTA gives special weight to the term "insider," but only in that it provides special remedies if insiders are *transferees*. *See* HRS §§ 651C-4 (insider transfer as badge of fraud), 651C-5(b)(special creditor claim with respect to insiders).

For example, if the SS entities had successfully transferred their properties to insiders, such as SS's own officers (*e.g.*, if the SS Companies were causd to confer some secret benefit to the Kinoshitas, Toshio, or Mukai, or entered an agreement with Defendants to channel some secret benefit back to the Kinoshitas), then the UFTA definitions of "insider" would apply to those transfers. This is what happened with respect to an RMS transfer, in which Satoshi deeded property to RMS in partial payment of the "termination fees" due under the RMS Management Agreements entered in 2000. Ex. "33".

### G. What *Really* Happened: Defendants Got a Sweet Deal that Harmed the SS Companies.

Toshio and the former management acted with the intent to hinder, delay or defraud their creditors by encumbering and "protecting" the SS Hawaii properties. *See* Exs. "5" & "17". Due to Toshio's efforts to scuttle the SS Companies, Defendants purchased the SS Hawai`i properties for substantially less than reasonably equivalent value. The SS Companies are entitled to recover their former properties from Defendants, or to receive fair value for them.

### 1. There were five (or more) distinct transfers.

Defendants claim this was a "bulk" sale of properties and that they bought both the "good and the bad." Mtn. at 23-26. Defendants offer no evidence of the fair value of the properties in support of this argument.[10] Of course, even if the Court were to find this was a "bulk" sale, the question of whether the price Defendants' paid for each of the properties was reasonably equivalent would remain. Defendants offer no coherent way to measure this, and no evidence to support their conclusions regarding value.

> **2.    The Maui Sewage Treatment Plant Was Not a Liability; Prospective Buyers Offered Substantially More Cash for the STP and the Maui Property than Defendants Paid.**

Defendants argue (without authority) that a "properly pled" case would not ignore the Maui Sewage Treatment Plant (the "STP") that Defendants purchased. Mtn. at 23-26 & n.9. In light of the evidence which has been produced to them, Defendants' argument is frivolous.[11]

Defendants already know, through documents produced to them, that after September 11, 2001 several buyers offered to pay *in cash* substantially more than Defendants' allocated price for

---

[10] The documents for the transfers show there were five closings, five transfers through five deeds, for multiple allocated prices, multiple conveyance tax certificates, and even five Bulk Transfer reports. *See* Exs. "28" – "29".

[11] Further, the Defendants provide no evidence of the "liability" or benefit the STP provides (*e.g.*, whether it still provides effluent for the Pukalani golf course).

the SS Maui property *including the STP*.  Def's. Ex. "T" (at A12509); Ex. "11".

Concerning the alleged risk and liability of the STP, the Defendants protest too much.  Despite their complaints, Defendants waited *three years* after the transfer (until 2005) to make the obvious step of applying in the Public Utilities Commission for rate increases for the STP.  Ex. "36".  Also, the STP-alleged to be on the verge of collapse since 2001-is apparently still functioning.  Melch. Decl. at ¶ 41.  Defendants' own actions indicate the STP is not the "bad" property they claim it to be.  Indeed, Defendants offer nothing in terms of the analysis of how the STP could support development of SS's former Maui property, or of the value it provides the Pukalani Country Club.

Defendants have also failed to show why the alleged liability posed by the STP could not be isolated by placing the entity into a bankruptcy proceeding.

## V.    REQUEST FOR CONTINUANCE PURSUANT TO F.R.C.P. RULE 56(f).

In August, 2002, SS-Japan demanded that all SS files held by Mukai's firm, McCorriston Miller Mukai MacKinnon, be delivered to successor counsel, Alston Hunt Floyd & Ing.  Melchinger Decl. at ¶3.  Due to Mukai's firm's limited response, in March, 2003, Sports Shinko subpoenaed those documents.  *Id.* at ¶ 4.  After two motions to compel compliance with the subpoena, Mukai's firm finally delivered the bulk of SS's documents in their possession by the end of 2003.

Having found evidence of other documents that had not been produced in the interim, on October 5, 2005, in the consolidated suits, Plaintiffs again demanded production from Mukai of all other documents that might be relevant, especially electronic documents. Mukai's counsel finally agreed to produce more than two additional boxes of documents that were earlier withheld. *Id.* at ¶ 6.

Plaintiffs have not yet received these documents, and nothing appears to be in electronic form, as requested. *Id.* at ¶ 7. Further, Plaintiffs are still attempting to recover electronic documents from Satoshi Kinoshita, who has not yet reviewed and produced certain documents delivered to his attorney for privilege review for some seven months, in addition to documents from his home hard drive. *Id.* at ¶ 8.

If the Court has any doubt about denying this Motion, SS must provided pursuant to FRCP 56(f) with an opportunity to complete discovery of, among other things, Satoshi Kinoshita's communications by Mukai and Satoshi Kinoshita related to the subject transfers. *Id.* at ¶ 9.

## VI. CONCLUSION

Defendants have asked this Court to dismiss Plaintiff's claims without discussion of essential legal issues or supporting authority. For the foregoing reasons, the Motion must be denied.

DATED:    Honolulu, Hawai`i, February 17, 2006.


                        _____/S/ Glenn Melchinger_____
                        PAUL ALSTON
                        GLENN T. MELCHINGER

                        Attorneys for Plaintiffs
                        and Third-Party Defendants,
                        the SS Entities