| Description | Docu... | V... | Au... | Class | Client Description | Case Description | Create Date |
|---|---|---|---|---|---|---|---|
| 1113 sex.mano | 814 | 1 | MYA | OFFMEMO | SPORTS SHINKO (USA) CO., LTD. | GENERAL | 11/13/2001 5:06:07 PM |
| Fax Transmittal - Fukuda, Tsujio | 815 | 1 | ISCH | FAX_TRAN | SPORTS SHINKO (USA) CO., LTD. | GENERAL | 11/13/2001 5:35:17 PM |
| stock purchase | 1,227 | 1 | ISCH | AGMT | SPORTS SHINKO (HAWAII) CO., LTD | CORPORATE | 12/5/2001 2:16:09 PM |
| Purchase and Sale Agreement | 1,291 | 1 | IETK | AGMT | SPORTS SHINKO RESORT HOTEL CORPO | CORPORATE | 12/5/2001 2:17:52 PM |
| stock purchase | 1,328 | 1 | ISCH | AGMT | SPORTS SHINKO (HAWAII) CO., LTD | CORPORATE | 12/6/2001 10:49:16 AM |
| Purchase and Sale Agreement (Hotel) | 1,355 | 1 | ISCH | AGMT | SPORTS SHINKO (WAIKIKI) CORPORATI | OCEAN RESORT HOTEL, WAIKIKI & QUEEN KAPI | 12/6/2001 12:13:37 PM |
| Purchase and Sale Agreement | 1,391 | 1 | IETK | AGMT | SPORTS SHINKO RESORT HOTEL CORPO | CORPORATE | 12/6/2001 3:11:07 PM |
| Purchase and Sale (golf) | 1,424 | 1 | IPIH | AGMT | SPORTS SHINKO (MILILANI) CO., LTD | CORPORATE | 12/6/2001 5:11:53 PM |
| Exhibit A - Sports Shinko | 1,644 | 1 | IPIH | LIST+IND | SPORTS SHINKO (HAWAII) CO., LTD | MILILANI GOLF COURSE | 12/7/2001 1:27:04 PM |
| Sports Shinko Transmittal | 1,684 | 1 | IPIH | FAX_TRAN | SPORTS SHINKO (HAWAII) CO., LTD | GENERAL | 12/12/2001 1:17:22 PM |
| Kobayashi Group Transmittal | 1,887 | 1 | IPIH | FAX_TRAN | SPORTS SHINKO (HAWAII) CO., LTD | GENERAL | 12/17/2001 11:57:28 AM |
| List of Documents Transmitted | 4,542 | 1 | IAB | LIST+IND | SPORTS SHINKO (HAWAII) CO., LTD | GENERAL | 1/8/2002 9:50:51 AM |
| Tanaka Fax Transmittal | 4,574 | 1 | IPIH | FAX_TRAN | SPORTS SHINKO (HAWAII) CO., LTD | GENERAL | 1/8/2002 1:22:19 PM |
| Sports Shinko (Hawaii) Stable Request | 4,579 | 1 | IPIH | OFFMEMO | SPORTS SHINKO (HAWAII) CO., LTD | GENERAL | 1/8/2002 1:48:46 PM |
| SportsShinkoWaikikiEq | 4,620 | 1 | IETK | CORR | SPORTS SHINKO (WAIKIKI) CORPORATI | OCEAN RESORT HOTEL, WAIKIKI & QUEEN KAPI | 1/8/2002 9:35:10 PM |
| Sports Shinko Fax Transmittal | 4,644 | 1 | IEK | FAX_TRAN | SPORTS SHINKO (HAWAII) CO., LTD | GENERAL | 1/9/2002 9:34:53 AM |
| Ocean Resort Hotel - Property Description | 4,650 | 1 | ISCH | LANDDOC | SPORTS SHINKO (WAIKIKI) CORPORATI | OCEAN RESORT HOTEL, WAIKIKI & QUEEN KAPI | 1/9/2002 9:59:03 AM |
| Sports Shinko - Closing Checklist (KG Holdings) | 4,656 | 1 | ISCH | LIST+IND | SPORTS SHINKO (WAIKIKI) CORPORATI | CORPORATION | 1/9/2002 10:22:19 AM |
| Tanaka Transmittal | 4,657 | 1 | IPIH | FAX_TRAN | SPORTS SHINKO (HAWAII) CO., LTD | GENERAL | 1/9/2002 10:25:44 AM |
| Sports Shinko (Waikiki) - Release of Mortgage | 4,718 | 1 | IETK | LANDDOC | SPORTS SHINKO (HAWAII) CO., LTD | GENERAL | 1/9/2002 3:33:09 PM |
| Estate Management Agreements | 4,737 | 1 | ISCH | LIST+IND | SPORTS SHINKO RESORT HOTEL CORPO | CORPORATE | 1/9/2002 6:51:26 PM |
| Sports Shinko (Waikiki) Resolution | 4,753 | 1 | ISMM | BUSDOC | SPORTS SHINKO (WAIKIKI) CORPORATI | CORPORATION | 1/10/2002 9:19:39 AM |
| SORE TRANSPORTATION RESOLUTION | 4,792 | 1 | ISMM | BUSDOC | SPORTS SHINKO (MILILANI) CO., LTD | CORPORATION | 1/10/2002 11:07:39 AM |
| Sports Shinko - Ex A - Tmk. (1) 2-6-27-18 | 5,026 | 1 | IPIH | BUSDOC | SPORTS SHINKO (HAWAII) CO., LTD | GENERAL | 1/14/2002 3:22:02 PM |
| Pukalani STP - Ex A - Tmk (2) 2-3-46-51:6 & 2-3-57-123 | 5,029 | 1 | IPIH | BUSDOC | SPORTS SHINKO (HAWAII) CO., LTD | GENERAL | 1/14/2002 3:28:53 PM |
| SPORTS SHINKO - Ex A - Tmk: (1) 9-5-1-35 & 9-5-1-76 | 5,049 | 1 | IPIH | BUSDOC | SPORTS SHINKO (HAWAII) CO., LTD | GENERAL | 1/14/2002 3:36:08 PM |
| Sports Shinko (Kauai) On Resolution | 5,051 | 1 | ISMM | BUSDOC | SPORTS SHINKO (KAUAI) CO., LTD | CORPORATE | 1/14/2002 3:49:21 PM |
| Sports Shinko (Mililani) Resolution | 5,053 | 1 | ISMM | BUSDOC | SPORTS SHINKO (MILILANI) CO., LTD | CORPORATE | 1/14/2002 6:17:33 PM |
| Sports Shinko (Mililani) Revised Resolution | 5,064 | 1 | ISMM | BUSDOC | SPORTS SHINKO (MILILANI) CO., LTD | CORPORATE | 1/14/2002 6:41:10 PM |
| Sports Shinko (Pukalani) Resolution | 5,065 | 1 | ISMM | BUSDOC | SPORTS SHINKO (PUKALANI) CO., LTD | CORPORATE | 1/14/2002 6:41:36 PM |
| Sports Shinko (Hawaii) Resolution | 5,057 | 1 | ISMM | BUSDOC | SPORTS SHINKO (HAWAII) CO., LTD | CORPORATE | 1/14/2002 7:11:14 PM |

11/20/03 11:41:23

1/15

**EXHIBIT** 23

STOCK PURCHASE AGREEMENT

By and Between

_____

AND

_____

_____ ___, 200__

## TABLE OF CONTENTS

1.  Definitions . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

2.  Purchase and Sale of Target Shares . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5
    (a)  Basic Transaction . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5
    (b)  Purchase Price . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6
    (c)  Net Cash Payment to Seller . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6
    (d)  The Closing . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6
    (e)  Deliveries at the Closing . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

3.  Representations and Warranties Concerning the Transaction . . . . . . . . . . . . . . . . . . . . . . . . 7
    (a)  Representations and Warranties of the Seller . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7
    (b)  Representations and Warranties of the Buyer . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

4.  Representations and Warranties Concerning the Target and Its Subsidiaries . . . . . . . . . . . . 9
    (a)  Organization, Qualification, and Corporate Power . . . . . . . . . . . . . . . . . . . . . . . . . . 9
    (b)  Capitalization . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9
    (c)  Noncontravention . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10
    (d)  Brokers' Fees . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10
    (e)  Title to Tangible Assets . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10
    (f)  Subsidiaries . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10
    (g)  Financial Statements . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10
    (h)  Events Subsequent to Most Recent Fiscal Month End . . . . . . . . . . . . . . . . . . . . . . . 11
    (i)  Legal Compliance . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11
    (j)  Tax Matters . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11
    (k)  Real Property . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12
    (l)  Intellectual Property . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13
    (m)  Contracts . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13
    (n)  Powers of Attorney . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13
    (o)  Litigation . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13
    (p)  Employee Benefits . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13
    (q)  Environmental, Health, and Safety Matters . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14
    (r)  Certain Business Relationships with the Target and Its Subsidiaries . . . . . . . . . . . . . 15
    (s)  Disclaimer of other Representations and Warranties . . . . . . . . . . . . . . . . . . . . . . . . . 15

5.  Pre-Closing Covenants . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15
    (a)  General . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16
    (b)  Notices and Consents . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16
    (c)  Operation of Business . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16
    (d)  Full Access . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16
    (e)  Notice of Developments . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17
    (f)  Exclusivity . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

6.  Post-Closing Covenants . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18
    (a)  General . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18
    (b)  Litigation Support . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

(c)   Transition . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   19
(d)   Covenant Not to Compete . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   19
(e)   Buyer Notes . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   19

7.   Conditions to Obligation to Close . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   19
(a)   Conditions to Obligation of the Buyer . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   19
(b)   Conditions to Obligation of the Seller . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   20

8.   Remedies for Breaches of This Agreement . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   21
(a)   Survival of Representations and Warranties . . . . . . . . . . . . . . . . . . . . . . . . . . .   21
(b)   Indemnification Provisions for Benefit of the Buyer . . . . . . . . . . . . . . . . . . . . .   22
(c)   Indemnification Provisions for Benefit of the Seller . . . . . . . . . . . . . . . . . . . . .   23
(d)   Matters Involving Third Parties . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   24
(e)   Determination of Adverse Consequences . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   24
(f)   Exclusive Remedy . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   25
(g)   Environmental Remedies . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   25

9.   Termination . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   26
(a)   Termination of Agreement . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   26
(b)   Effect of Termination . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   27

10.   Miscellaneous . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   27
(a)   Nature of Certain Obligations . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   27
(b)   Press Releases and Public Announcements . . . . . . . . . . . . . . . . . . . . . . . . . . . .   27
(c)   No Third-Party Beneficiaries . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   28
(d)   Entire Agreement . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   28
(e)   Succession and Assignment . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   28
(f)   Counterparts . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   28
(g)   Headings . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   28
(h)   Notices . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   28
(i)   Governing Law . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   28
(j)   Amendments and Waivers . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   28
(k)   Severability . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   29
(l)   Expenses . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   29
(m)   Construction . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   29
(n)   Incorporation of Exhibits, Annexes, and Schedules . . . . . . . . . . . . . . . . . . . . . .   29

Exhibit A—Financial Statements
Annex I—Exceptions to the Seller's Representations and Warranties Concerning the Transaction
Annex II—Exceptions to the Buyer's Representations and Warranties Concerning the Transaction
Disclosure Schedule—Exceptions to Representations and Warranties Concerning the Target and Its
   Subsidiaires

# STOCK PURCHASE AGREEMENT

THIS STOCK PURCHASE AGREEMENT is entered into on _____ ___, _____, by and between _____, a _____ corporation (the "Buyer"), and SPORTS SHINKO (HAWAII) CO., LTD., a Hawaii corporation (collectively the "Seller"). The Buyer and the Seller are referred to collectively herein as the "Parties."

The Seller in the aggregate own all of the outstanding capital stock of _____, a Hawaii corporation (the "Target").

This Agreement contemplates a transaction in which the Buyer will purchase from the Seller, and the Seller will sell to the Buyer, all of the outstanding capital stock of the Target in return for cash.

Now, therefore, in consideration of the premises and the mutual promises herein made, and in consideration of the representations, warranties, and covenants herein contained, the Parties agree as follows.

1.    Definitions.

"Adverse Consequences" means all actions, suits, proceedings, hearings, investigations, charges, complaints, claims, demands, injunctions, judgments, orders, decrees, rulings, damages, dues, penalties, fines, costs, reasonable amounts paid in settlement, liabilities, obligations, taxes, liens, losses, expenses, and fees, including court costs and reasonable attorneys' fees and expenses.

"Affiliate" has the meaning set forth in Rule 12b-2 of the regulations promulgated under the Securities Exchange Act.

"Affiliated Group" means any affiliated group within the meaning of Code §1504(a) [or any similar group defined under a similar provision of state, local or foreign law].

"Buyer" has the meaning set forth in the preface above.

"Cash" means cash and cash equivalents (including marketable securities and short term investments) calculated in accordance with GAAP applied on a basis consistent with the preparation of the Financial Statements.

"Closing" has the meaning set forth in §2(d) below.

"Closing Date" has the meaning set forth in §2(d) below.

"Code" means the Internal Revenue Code of 1986, as amended.

- 1 -

"Confidential Information" means any information concerning the businesses and affairs of the Target and its Subsidiaries that is not already generally available to the public.

"Disclosure Schedule" has the meaning set forth in §4 below.

"Environmental, Health, and Safety Requirements" shall mean all federal, state, local and foreign statutes, regulations, and ordinances concerning public health and safety, worker health and safety, and pollution or protection of the environment, including without limitation all those relating to the presence, use, production, generation, handling, transportation, treatment, storage, disposal, distribution, labeling, testing, processing, discharge, release, threatened release, control, or cleanup of any hazardous materials, substances or wastes, as such requirements are enacted and in effect on or prior to the Closing Date.

"Financial Statement" has the meaning set forth in §4(g) below.

"GAAP" means United States generally accepted accounting principles as in effect from time to time.

"Hart-Scott-Rodino Act" means the Hart-Scott-Rodino Antitrust Improvements Act of 1976, as amended.

"Income Tax" means any federal, state, local, or foreign income tax, including any interest, penalty, or addition thereto, whether disputed or not.

"Income Tax Return" means any return, declaration, report, claim for refund, or information return or statement relating to Income Taxes, including any schedule or attachment thereto.

"Indemnified Party" has the meaning set forth in §8(d) below.

"Indemnifying Party" has the meaning set forth in §8(d) below.

"Knowledge" means actual knowledge without independent investigation.

"Leased Real Property" means all leasehold or subleasehold estates and other rights to use or occupy any land, buildings, structures, improvements, fixtures or other interest in real property which is used in the Target's or its Subsidiaries' business.

"Leases" means all leases, subleases, licenses, concessions and other agreements (written or oral), including all amendments, extensions, renewals, guaranties and other agreements with respect thereto, pursuant to which any of the Target or its Subsidiaries holds any Leased Real Property.

"Most Recent Financial Statements" has the meaning set forth in §4(g) below.

"Most Recent Fiscal Month End" has the meaning set forth in §4(g) below.

"Ordinary Course of Business" means the ordinary course of business consistent with part custom and practice (including with respect to quantity and frequency).

"Owned Real Property" means all land, together with all buildings, structures, improvements and fixtures located thereon, and all easements and other rights and interests appurtenant thereto, owned by any of the Target or its Subsidiaries and used in the business of the Target and its Subsidiaries taken as a whole.

"Party" has the meaning set forth in the preface above.

"Permitted Encumbrances" means with respect to each parcel of Owned Real Property: (a) real estate taxes, assessments and other governmental levies, fees or charges imposed with respect to such Owned Real Property which are not due and payable as of the Closing Date or which are being contested by appropriate proceedings; (b) mechanics liens and similar liens for labor, materials or supplies provided with respect to such Owned Real Property incurred in the ordinary course of business for amounts which are not delinquent and which would not, in the aggregate, have a material adverse effect on the business of the Target and its Subsidiaries taken as a whole or which are being contested by appropriate proceedings; (c) zoning, building codes and other land use laws regulating the use or occupancy of such Owned Real Property or the activities conducted thereon which are imposed by any governmental authority having jurisdiction over such Owned Real Property; (d) liens for any financing secured by such Owned Real Property which is an obligation of any of the Target or its Subsidiaries which will not be paid off at Closing; and (e) easements, covenants, conditions, restrictions and other similar matters affecting title to such Owned Real Property and other title defects, all of which do not or would not materially impair the use or occupancy of such Owned Real Property in the operation of the business of the Target and its Subsidiaries taken as a whole.

"Person" means an individual, a partnership, a corporation, an association, a joint stock company, a trust, a joint venture, an unincorporated organization, or a governmental entity (or any department, agency, or political subdivision thereof).

"Purchase Price" has the meaning set forth in §2(b) below.

"Securities Act" means the Securities Act of 1933, as amended.

"Securities Exchange Act" means the Securities Exchange Act of 1934, as amended.

"Security Interest" means any mortgage, pledge, lien, encumbrance, charge, or other security interest, other than (a) mechanic's, materialmen's, and similar liens, (b) liens for taxes not yet due and payable [or for taxes that the taxpayer is contesting in good faith through appropriate proceedings], (c) purchase money liens and liens securing rental payments under capital lease

- 3 -

arrangements, and (d) other liens arising in the Ordinary Course of Business and not incurred in connection with the borrowing of money.

"Seller" has the meaning set forth in the preface above.

"Subsidiary" means any corporation with respect to which a specified Person (or a Subsidiary thereof) owns a majority of the common stock or has the power to vote or direct the voting of sufficient securities to elect a majority of the directors.

"Target" has the meaning set forth in the preface above.

"Target Share" means any share of the Common Stock, par value $___ per share, of the Target.

"Tax" means any federal, state, local, or foreign income, gross receipts, license, payroll, employment, excise, severance, stamp, occupation, premium, windfall profits, environmental (including taxes under Code §59A), customs duties, capital stock, franchise, profits, withholding, social security (or similar), unemployment, disability, real property, personal property, sales, use, transfer, registration, value added, alternative or add-on minimum, estimated, or other tax of any kind whatsoever, including any interest, penalty, or addition thereto, whether disputed or not.

"Tax Return" means any return, declaration, report, claim for refund, or information return or statement relating to Taxes, including any schedule or attachment thereto, and including any amendment thereof.

"Third Party Claim" has the meaning set forth in §8(d) below.

2.    Purchase and Sale of Target Shares.

(a)    Basic Transaction.    On and subject to the terms and conditions of this Agreement, the Buyer agrees to purchase from the Seller, and the Seller agrees to sell to the Buyer, all of his or its Target Shares for the consideration specified below in this §2.

(b)    Purchase Price.    The Buyer agrees to pay to the Seller a total purchase price of $___ (the "Purchase Price").    Buyer expressly represents that this is a firm price and that it has no intention to request any decrease in the Purchase Price at any other time.

(c)    Net Cash Payment to Seller.    Immediately prior to the Closing, the Seller will cause the Target to pay the Seller in proportion to their respective holdings of Target Shares an aggregate amount (and may cause each Subsidiary of the Target to pay to the Target any necessary component thereof) equal to the Seller's good faith estimate of the excess (if any) of (i) the consolidated Cash of the Target and its Subsidiaries as of the Closing over (ii) the aggregate liability of the Target and its Subsidiaries for unpaid Income Taxes as of the Closing (computed in accordance with the past

custom and practice of the Target and its Subsidiaries in filing their Income Tax Returns). The Seller may cause (A) the Target to make any such payment to them in the form of a dividend or a redemption and (B) any Subsidiary of the Target to make any such payment to the Target in the form of a dividend, a redemption, or an intercompany loan.

(d)  The Closing.  The closing of the transactions contemplated by this Agreement (the "Closing") shall take place at the offices of ____ in ____, _____, commencing at 9:00 a.m. local time on the [second] business day following the satisfaction or waiver of all conditions to the obligations of the Parties to consummate the transactions contemplated hereby (other than conditions with respect to actions the respective Parties will take at the Closing itself) or such other date as the Buyer and the Seller may mutually determine (the "Closing Date").

(e)  Deliveries at the Closing.  At the Closing, (i) the Seller will deliver to the Buyer the various certificates, instruments, and documents referred to in §7(a) below, (ii) the Buyer will deliver to the Seller the various certificates, instruments, and documents referred to in §7(b) below, (iii) the Seller will deliver to the Buyer stock certificates representing all of his or its Target Shares, endorsed in blank or accompanied by duly executed assignment documents, and (iv) the Buyer will deliver to the Seller the consideration specified in §2(b) above.

3.  Representations and Warranties Concerning the Transaction.

(a)  Representations and Warranties of the Seller. Each of the Seller represents and warrants to the Buyer that the statements contained in this §3(a) are correct and complete as of the date of this Agreement and will be correct and complete as of the Closing Date (as though made then and as though the Closing Date were substituted for the date of this Agreement throughout this §3(a)) with respect to himself or itself, except as set forth in Annex I attached hereto.

(i)  Organization of Certain Seller.  The Seller is duly organized, validly existing, and in good standing under the laws of the jurisdiction of its incorporation.

(ii)  Authorization of Transaction.  The Seller has full power and authority to execute and deliver this Agreement and to perform his or its obligations hereunder. This Agreement constitutes the valid and legally binding obligation of the Seller, enforceable in accordance with its terms and conditions. The Seller need not give any notice to, make any filing with, or obtain any authorization, consent, or approval of any government or governmental agency in order to consummate the transactions contemplated by this Agreement.

(iii)  Noncontravention. Neither the execution and the delivery of this Agreement, nor the consummation of the transactions contemplated hereby, will (A) violate any constitution, statute, regulation, rule, injunction, judgment, order, decree, ruling, charge, or other restriction of any government, governmental agency, or court to which the Seller is subject or, if the Seller is a corporation, any provision of its charter or bylaws or (B) conflict with, result in a breach of, constitute a default under, result in the acceleration of, create in any

party the right to accelerate, terminate, modify, or cancel, or require any notice under any agreement, contract, lease, license, instrument, or other arrangement to which the Seller is a party or by which he or it is bound or to which any of his or its assets is subject.

(iv)     <u>Brokers' Fees</u>.  The Seller has no liability or obligation to pay any fees or commissions to any broker, finder, or agent with respect to the transactions contemplated by this Agreement for which the Buyer could become liable or obligated.

(v)     <u>Target Shares</u>.  The Seller holds of record and owns beneficially all of Target Shares, free and clear of any restrictions on transfer (other than restrictions under the Securities Act and state securities laws), taxes, Security Interests, options, warrants, purchase rights, contracts, commitments, equities, claims, and demands.  The Seller is not a party to any option, warrant, purchase right, or other contract or commitment that could require the Seller to sell, transfer, or otherwise dispose of any capital stock of the Target (other than this Agreement).  The Seller is not a party to any voting trust, proxy, or other agreement or understanding with respect to the voting of any capital stock of the Target.

(b)     <u>Representations and Warranties of the Buyer</u>.  The Buyer represents and warrants to the Seller that the statements contained in this §3(b) are correct and complete as of the date of this Agreement and will be correct and complete as of the Closing Date (as though made then and as though the Closing Date were substituted for the date of this Agreement throughout this §3(b)), except as set forth in Annex II attached hereto.

(i)     <u>Organization of the Buyer</u>.  The Buyer is a corporation duly organized, validly existing, and in good standing under the laws of the jurisdiction of its incorporation.

(ii)     <u>Authorization of Transaction</u>.  The Buyer has full power and authority (including full corporate power and authority) to execute and deliver this Agreement and to perform its obligations hereunder.  This Agreement constitutes the valid and legally binding obligation of the Buyer, enforceable in accordance with its terms and conditions.  The Buyer need not give any notice to, make any filing with, or obtain any authorization, consent, or approval of any government or governmental agency in order to consummate the transactions contemplated by this Agreement.

(iii)     <u>Noncontravention</u>.  Neither the execution and the delivery of this Agreement, nor the consummation of the transactions contemplated hereby, will (A) violate any constitution, statute, regulation, rule, injunction, judgment, order, decree, ruling, charge, or other restriction of any government, governmental agency, or court to which the Buyer is subject or any provision of its charter or bylaws or (B) conflict with, result in a breach of, constitute a default under, result in the acceleration of, create in any party the right to accelerate, terminate, modify, or cancel, or require any notice under any agreement, contract, lease, license, instrument, or other arrangement to which the Buyer is a party or by which it is bound or to which any of its assets is subject.

(iv) <u>Brokers' Fees</u>. The Buyer has no liability or obligation to pay any fees or commissions to any broker, finder, or agent with respect to the transactions contemplated by this Agreement for which any Seller could become liable or obligated.

(v) <u>Investment</u>. The Buyer is not acquiring the Target Shares with a view to or for sale in connection with any distribution thereof within the meaning of the Securities Act.

4. <u>Representations and Warranties Concerning the Target and Its Subsidiaries</u>. The Seller represent and warrant to the Buyer that the statements contained in this §4 are correct and complete as of the date of this Agreement and will be correct and complete as of the Closing Date (as though made then and as though the Closing Date were substituted for the date of this Agreement throughout this §4), except as set forth in the disclosure schedule delivered by the Seller to the Buyer on the date hereof and initialed by the Parties (the "<u>Disclosure Schedule</u>").

(a) <u>Organization, Qualification, and Corporate Power</u>. Each of the Target and its Subsidiaries is a corporation duly organized, validly existing, and in good standing under the laws of the jurisdiction of its incorporation. Each of the Target and its Subsidiaries is duly authorized to conduct business and is in good standing under the laws of each jurisdiction where such qualification is required, except where the lack of such qualification would not have a material adverse effect on the financial condition of the Target and its Subsidiaries taken as a whole. Each of the Target and its Subsidiaries has full corporate power and authority to carry on the businesses in which it is engaged and to own and use the properties owned and used by it. §4(a) of the Disclosure Schedule lists the directors and officers of each of the Target and its Subsidiaries.

(b) <u>Capitalization</u>. The entire authorized capital stock of the Target consists of ____ Target Shares, of which ____ Target Shares are issued and outstanding and ____ Target Shares are held in treasury. All of the issued and outstanding Target Shares have been duly authorized, are validly issued, fully paid, and nonassessable. There are no outstanding or authorized options, warrants, purchase rights, subscription rights, conversion rights, exchange rights, or other contracts or commitments that could require the Target to issue, sell, or otherwise cause to become outstanding any of its capital stock. There are no outstanding or authorized stock appreciation, phantom stock, profit participation, or similar rights with respect to the Target.

(c) <u>Noncontravention</u>. To the Knowledge of the Seller, neither the execution and the delivery of this Agreement, nor the consummation of the transactions contemplated hereby, will (i) violate any constitution, statute, regulation, rule, injunction, judgment, order, decree, ruling, charge, or other restriction of any government, governmental agency, or court to which any of the Target and its Subsidiaries is subject or any provision of the charter or bylaws of any of the Target and its Subsidiaries or (ii) conflict with, result in a breach of, constitute a default under, result in the acceleration of, create in any party the right to accelerate, terminate, modify, or cancel, or require any notice under any agreement, contract, lease, license, instrument, or other arrangement to which any of the Target and its Subsidiaries is a party or by which it is bound or to which any of its assets is subject (or result in the imposition of any Security Interest upon any of its assets), except where the

violation , conflict, breach, default, acceleration, termination, modification, cancellation, failure to give notice, or Security Interest would not have a material adverse effect on the financial condition of the Target and its Subsidiaries taken as a whole or on the ability of the Parties to consummate the transactions contemplated by this Agreement. To the Knowledge of the Seller, none of the Target and its Subsidiaries needs to give any notice to, make any filing with, or obtain any authorization, consent, or approval of any government or governmental agency in order for the Parties to consummate the transactions contemplated by this Agreement, except where the failure to give notice, to file, or to obtain any authorization, consent, or approval would not have a material adverse effect on the financial condition of the Target and its Subsidiaries taken as a whole or on the ability of the Parties to consummate the transactions contemplated by this Agreement.

(d)  Brokers' Fees.  None of the Target and its Subsidiaries has any liability or obligation to pay any fees or commissions to any broker, finder, or agent with respect to the transactions contemplated by this Agreement.

(e)  Title to Tangible Assets.  The Target and its Subsidiaries have good title to, or a valid leasehold interest in, the material tangible assets they use regularly in the conduct of their businesses.

(f)  Subsidiaries.  §4(f) of the Disclosure Schedule sets forth for each Subsidiary of the Target (i) its name and jurisdiction of incorporation, (ii) the number of shares of authorized capital stock of each class of its capital stock, (iii) the number of issued and outstanding shares of each class of its capital stock, the names of the holders thereof, and the number of shares held by each such holder, and (iv) the number of shares of its capital stock held in treasury. All of the issued and outstanding shares of capital stock of each Subsidiary of the Target have been duly authorized and are validly issued, fully paid, and nonassessable. One of the Target and its Subsidiaries holds of record and owns beneficially all of the outstanding shares of each Subsidiary of the Target.

(g)  Financial Statements.  Attached hereto as Exhibit A are the following financial statements (collectively the "Financial Statements"): (i) audited consolidated balance sheets and statements of income, changes in stockholders' equity, and cash flow as of and for the fiscal years ended _____ ___, _____, _____ ___, _____, _____, _____, _____ ___, _____, and _____ ___, _____ for the Target and its Subsidiaries; and (ii) unaudited consolidated balance sheets and statements of income, changes in stockholders' equity, and cash flow (the "Most Recent Financial Statements") as of and for the ___ months ended _____ ___, _____ (the "Most Recent Fiscal Month End") for the Target and its Subsidiaries. The Financial Statements (including the notes thereto) have been prepared in accordance with GAAP applied on a consistent basis throughout the periods covered thereby and present fairly the financial condition of the Target and its Subsidiaries as of such dates and the results of operations of the Target and its Subsidiaries for such periods.

(h)  Events Subsequent to Most Recent Fiscal Month End.  Since the Most Recent Fiscal Month End, there has not been any material adverse change in the financial condition of the Target and its Subsidiaries taken as a whole. Without limiting the generality of the foregoing, since that

- 8 -

date none of the Target and its Subsidiaries has engaged in any practice, taken any action, or entered into any transaction outside the Ordinary Course of Business the primary purpose or effect of which has been to generate or preserve Cash.

(i)  <u>Legal Compliance</u>.  To the Knowledge of the Seller, each of the Target and its Subsidiaries has complied with all applicable laws (including rules, regulations, codes, plans, injunctions, judgments, orders, decrees, rulings, and charges thereunder) of federal, state, local, and foreign governments (and all agencies thereof), except where the failure to comply would not have a material adverse effect upon the financial condition of the Target and its Subsidiaries taken as a whole.

(j)  <u>Tax Matters</u>.

(i)  Each of the Target and its Subsidiaries has filed all Income Tax Returns that it was required to file, and has paid all Income Taxes shown thereon as owing, except where the failure to file Income Tax Returns or to pay Income Taxes would not have a material adverse effect on the financial condition of the Target and its Subsidiaries taken as a whole.

(ii)  §4(j), of the Disclosure Schedule lists all Income Tax Returns filed with respect to any of the Target and its Subsidiaries for taxable periods ended on or after _____ ___, _____, indicates those Income Tax Returns that have been audited, and indicates those Income Tax Returns that currently are the subject of audit.  The Seller have delivered to the Buyer correct and complete copies of all federal Income Tax Returns, examination reports, and statements of deficiencies assessed against or agreed to by any of the Target and its Subsidiaries since _____ ___, _____.

(iii)  None of the Target and its Subsidiaries has waived any statute of limitations in respect of Income Taxes or agreed to any extension of time with respect to an Income Tax assessment or deficiency.

(iv)  None of the Target and its Subsidiaries is a party to any Income Tax allocation or sharing agreement.

(k)  <u>Real Property</u>.

(i)  §4(k)(i) of the Disclosure Schedule sets forth the address and description of each parcel of Owned Real Property.  With respect to each parcel of Owned Real Property, and except for matters that would not have a material adverse effect on the business of the Target and its Subsidiaries taken as a whole:

(A)  the Target or one of its Subsidiaries has good and marketable title, free and clear of all liens and encumbrances, except Permitted Encumbrances;

- 9 -

(B) except as set forth in §4(k)(i)(B) of the Disclosure Schedule, none of the Target or its Subsidiaries has leased or otherwise granted to any Person the right to use or occupy such Owned Real Property or any portion thereof; and

(C) there are no outstanding options, rights of first offer or rights of first refusal to purchase such Owned Real Property or any portion thereof or interest therein.

(ii)    §4(k)(ii) of the Disclosure Schedule sets forth the address of each parcel of Leased Real Property, and a true and complete list of all Leases for each such parcel of Leased Real Property.  The Seller have delivered to the Buyer a true and complete copy of each such Lease document.

(l)    Contracts.  §4(m) of the Disclosure Schedule lists all written contracts and other written agreements to which any of the Target and its Subsidiaries is a party the performance of which will involve consideration in excess of $___.  The Seller have delivered to the Buyer a correct and complete copy of each contract or other agreement listed in 4(m) of the Disclosure Schedule (as amended to date).

(m)    Powers of Attorney.  To the Knowledge of the Seller, there are no outstanding powers of attorney executed on behalf of any of the Target and its Subsidiaries.

(n)    Litigation.  §4(o) of the Disclosure Schedule sets forth each instance in which any of the Target and its Subsidiaries (i) is subject to any outstanding injunction, judgment, order, decree, ruling, or charge or (ii) is a party to any action, suit, proceeding, hearing, or investigation of, in, or before any court or quasi-judicial or administrative agency of any federal, state, local, or foreign jurisdiction, except where the injunction, judgment, order, decree, ruling, action, suit, proceeding, hearing, or investigation would not have a material adverse effect on the financial condition of the Target and its Subsidiaries taken as a whole.

(o)    Certain Business Relationships with the Target and Its Subsidiaries.  None of the Seller and their Affiliates has been involved in any material business arrangement or relationship with any of the Target and its Subsidiaries within the past 12 months and none of the Seller and their Affiliates owns any material asset, tangible or intangible, which is used in the business of any of the Target and its Subsidiaries.

(p)    Disclaimer of other Representations and Warranties.  Except as expressly set forth in Section 3 and this Section 4, the Seller make no representation or warranty, express or implied, at law or in equity, in respect of the Target, its Subsidiaries, or any of their respective assets, liabilities or operations, including, without limitation, with respect to merchantability or fitness for any particular purpose, and any such other representations or warranties are hereby expressly disclaimed. Buyer hereby acknowledges and agrees that, except to the extent specifically set forth in Section 3 and this Section 4, the Buyer is purchasing the Target shares on an "as-is, where-is" basis.

Buyer acknowledges that it has had adequate and complete opportunity to inspect and review the assets of the Target and its Subsidiaries, including without limitation a physical inspection of the Owned Real Property; review of the title condition; conduct of such tests, surveys and inspections as Buyer deems reasonably necessary; and consultation with Buyer's engineers, experts and consultants. Buyer has had adequate opportunity and time to evaluate the assets of the Target and its Subsidiaries and the suitability of the assets of the Target and its Subsidiaries for Buyer's use and purposes. Buyer hereby waives any claim of any kind or nature against Seller, its agents and attorneys, with respect to the assets of the Target. By placing its initials below, Buyer acknowledges that it has read and understands this § 4(o) and that it was represented by counsel who explained the consequences of this waiver provision at the time this Agreement was executed.

Buyer's initials: _____

Seller expressly disclaims any and all liability for representations or warranties, expressed or implied, with respect to the Target Shares, the financial condition of the Target and its Subsidiaries, the assets of the Target and its Subsidiaries or any matters related thereto contained in information or omissions from information or any written or oral communications transmitted or made available to Buyer by Seller, its agents or attorneys, or anyone else. Buyer acknowledges that (i) neither Seller, nor any principal, agent, attorney, employee, broker or other representative of Seller has made representations or warranties of any kind whatsoever, either express or implied, with respect to the Target Shares, the financial condition of the Target and the assets of the Target and its Subsidiaries or any matters related thereto, (ii) Buyer is not relying on any warranty, representations or warranties of any kind whatsoever, either express or implied, with respect to the Target Shares, the financial condition of the Target and its Subsidiaries or the assets of the Target and its Subsidiaries, and (iii) **Buyer is acquiring the Target Shares on an "AS-IS, WHERE-IS" basis**. Buyer acknowledges that Seller nor its agents, employees or attorney has not made, nor is it expected to make, any representations or warranties with respect to the financial condition of the Target and its Subsidiaries or the use, occupation or management of the assets of the Target and its Subsidiaries. By placing its initials below, Buyer acknowledges that it has read and understands this § 4(o) and that it was represented by counsel who explained the consequences of this "AS-IS, WHERE-IS" provision at the time this Agreement was executed.

Buyer's initials: _____

5.    Pre-Closing Covenants. The Parties agree as follows with respect to the period between the execution of this Agreement and the Closing.

(a)    General. Each of the Parties will use his or its reasonable best efforts to take all action and to do all things necessary , proper, or advisable in order to consummate and make effective the transactions contemplated by this Agreement (including satisfaction, but not waiver, of the closing conditions set forth in §7 below).

(b)  <u>Notices and Consents</u>.  The Seller will cause each of the Target and its Subsidiaries to give any notices to third parties, and will cause each of the Target and its Subsidiaries to use its reasonable best efforts to obtain any third party consents, that the Buyer reasonably may request in connection with the matters referred to in §4(c) above. Each of the Parties will (and the Seller will cause each of the Target and its Subsidiaries to) give any notices to, make any filings with, and use its reasonable best efforts to obtain any authorizations, consents, and approvals of governments and governmental agencies in connection with the matters referred to in §3(a)(ii), §3(b)(ii) and §4(c) above.  Without limiting the generality of the foregoing, each of the Parties will file (and the Seller will cause each of the Target and its Subsidiaries to file) any Notification and Report Forms and related material that he or it may be required to file with the Federal Trade Commission and the Antitrust Division of the United States Department of Justice under the Hart-Scott-Rodino Act, will use his or its reasonable best efforts to obtain (and the Seller will cause each of the Target and its Subsidiaries to use its reasonable best efforts to obtain) a waiver from the applicable waiting period, and will make (and the Seller will cause each of the Target and its Subsidiaries to make) any further filings pursuant thereto that may be necessary [, proper, or advisable] in connection therewith.

(c)  <u>Operation of Business</u>.  The Seller will not cause or permit any of the Target and its Subsidiaries to engage in any practice, take any action, or enter into any transaction outside the Ordinary Course of Business.

(d)  <u>Notice of Developments</u>.

(i)  Seller may elect at any time to notify the Buyer of any development causing a breach of any of the representations and warranties in §4 above.  The written notice pursuant to this §5(e)(i) will be deemed to have amended the Disclosure Schedule, to have qualified the representations and warranties contained in §4 above, and to have cured any misrepresentation or breach of warranty that otherwise might have existed hereunder by reason of the development.

(ii)  Each Party will give prompt written notice to the others of any material adverse development causing a breach of any of his or its own representations and warranties in §3 above.  No disclosure by any Party pursuant to this §5(d)(ii), however, shall be deemed to amend or supplement Annex I, Annex II, or the Disclosure Schedule or to prevent or cure any misrepresentation or breach of warranty.

(e)  <u>Exclusivity</u>.  Seller will not (and the Seller will not cause or permit any of the Target and its Subsidiaries to) solicit, initiate, or encourage the submission of any proposal or offer from any Person relating to the acquisition of all or substantially all of the capital stock or assets of any of the Target and its Subsidiaries (including any acquisition structured as a merger, consolidation, or share exchange); <u>provided, however</u>, that the Seller, the Target, its Subsidiaries,

- 12 -

and their directors and officers will remain free to participate in any discussions or negotiations regarding, furnish any information with respect to, assist or participate in, or facilitate in any other manner any effort or attempt by any Person to do or seek any of the foregoing to the extent their fiduciary duties may require.

 6. <u>Post-Closing Covenants</u>.  The Parties agree as follows with respect to the period following the Closing.

 (a) <u>General</u>.  In case at any time after the Closing any further action is necessary to carry out the purposes of this Agreement, each of the Parties will take such further action (including the execution and delivery of such further instruments and documents) as any other Party reasonably may request, all at the sole cost and expense of the requesting Party (unless the requesting Party is entitled to indemnification therefor under §8 below).

 (b) <u>Litigation Support</u>.  In the event and for so long as any Party actively is contesting or defending against any action, suit, proceeding, hearing, investigation, charge, complaint, claim, or demand in connection with (i) any transaction contemplated under this Agreement or (ii) any fact, situation, circumstance, status, condition, activity, practice, plan, occurrence, event, incident, action, failure to act, or transaction on or prior to the Closing Date involving any of the Target and its Subsidiaries, each of the other Parties shall cooperate with him or it and his or its counsel in the defense or contest, make available their personnel, and provide such testimony and access to their books and records as shall be necessary in connection with the defense or contest, all at the sole cost and expense of the contesting or defending Party (unless the contesting or defending Party is entitled to indemnification therefor under §8 below).

 7. <u>Conditions to Obligation to Close</u>.

 (a) <u>Conditions to Obligation of the Buyer</u>.  The obligation of the Buyer to consummate the transactions to be performed by it in connection with the Closing is subject to satisfaction of the following conditions:

 (i) the representations and warranties set forth in §3(a) and §4 above shall be true and correct in all material respects at and as of the Closing Date;

 (ii) the Seller shall have performed and complied with all of their covenants hereunder in all material respects through the Closing;

 (iii) there shall not be any injunction, judgment, order, decree, ruling, or charge in effect preventing consummation of any of the transactions contemplated by this Agreement;

 (iv) all applicable waiting periods (and any extensions thereof) under the Hart-Scott-Rodino Act shall have expired or otherwise been terminated and the

Parties, the Target, and its Subsidiaries shall have received all other authorizations, consents, and approvals of governments and governmental agencies referred to in §3(a)(ii), §3(b)(ii), and §4(c) above;

(v)    all actions to be taken by the Seller in connection with consummation of the transactions contemplated hereby and all certificates, opinions, instruments, and other documents required to effect the transactions contemplated hereby will be reasonably satisfactory in form and substance to the Buyer.

The Buyer may waive any condition specified in this §7(a) if it executes a writing so stating at or prior to the Closing.

(b)    <u>Conditions to Obligation of the Seller</u>.    The obligation of the Seller to consummate the transactions to be performed by them in connection with the Closing is subject to satisfaction of the following conditions:

(i)    the representations and warranties set forth in §3(b) above shall be true and correct in all material respects at and as of the Closing Date;

(ii)    the Buyer shall have performed and complied with all of its covenants hereunder in all material respects through the Closing;

(iii)    there shall not be any injunction, judgment, order, decree, ruling, or charge in effect preventing consummation of any of the transactions contemplated by this Agreement;

(iv)    all applicable waiting periods (and any extensions thereof) under the Hart-Scott-Rodino Act shall have expired or otherwise been terminated and the Parties, the Target, and its Subsidiaries shall have received all other authorizations, consents, and approvals of governments and governmental agencies referred to in §3(a)(ii), §3(b)(ii), and §4(c) above;

(v)    the Seller shall have received from counsel to the Buyer an opinion in form and substance as set forth in Exhibit E attached hereto, addressed to the Seller, and dated as of the Closing Date; and

(vi)    all actions to be taken by the Buyer in connection with consummation of the transactions contemplated hereby and all certificates, opinions, instruments, and other documents required to effect the transactions contemplated hereby will be reasonably satisfactory in form and substance to the Seller.

The Seller may waive any condition specified in this §7(b) if they execute a writing so stating at or prior to the Closing.

- 14 -

8.    <u>Remedies for Breaches of This Agreement</u>.

(a)    <u>Survival of Representations and Warranties</u>.

None of the representations and warranties of the Seller contained in §4 above shall survive the Closing hereunder.  All of the representations and warranties of the Parties contained in §3 above shall survive the Closing (unless the damaged Party knew or had reason to know of any misrepresentation or breach of warranty at the time of Closing) and continue in full force and effect forever thereafter (subject to any applicable statutes of limitations).

(b)    <u>Indemnification Provisions for Benefit of the Buyer</u>.

(i)    In the event the Seller breaches any of their representations, warranties, and covenants contained herein (other than the covenants in §2(a) above and the representations and warranties in §3(a) above), and, if there is an applicable survival period pursuant to §8(a) above, provided that the Buyer makes a written claim for indemnification against the Seller pursuant to §9(g) below within such survival period, then the Seller agrees to indemnify the Buyer from and against any Adverse Consequences the Buyer shall suffer through and after the date of the claim for indemnification (but <u>excluding</u> any Adverse Consequences the Buyer shall suffer after the end of any applicable survival period) caused proximately by the breach; <u>provided, however,</u> that the Seller shall not have any obligation to indemnify the Buyer from and against any Adverse Consequences caused by the breach of any representation or warranty or covenant of the Seller contained in §4 above.

(ii)    In the event the Seller breaches any of his or its covenants in §2(a) above or any of his or its representations and warranties in §3(a) above, and, if there is an applicable survival period pursuant to §8(a) above, provided that the Buyer makes a written claim for indemnification against the Seller pursuant to §9(g) below within such survival period, then the Seller agrees to indemnify the Buyer from and against the entirety of any Adverse Consequences the Buyer shall suffer through and after the date of the claim for indemnification (but <u>excluding</u> any Adverse Consequences the Buyer shall suffer after the end of any applicable survival period) caused [proximately] by the breach.

(c)    <u>Indemnification Provisions for Benefit of the Seller</u>.  In the event the Buyer breaches any of its representations, warranties, and covenants contained herein, and, if there is an applicable survival period pursuant to §8(a) above, provided that the Seller makes a written claim for indemnification against the Buyer pursuant to §9(g) below within such survival period, then the Buyer agrees to indemnify the Seller from and against the entirety of any Adverse Consequences the Seller shall suffer through and after the date of the claim for indemnification (but <u>excluding</u> any

Adverse Consequences the Seller shall suffer after the end of any applicable survival period) caused by the breach.

  (d) <u>Matters Involving Third Parties</u>.

    (i) If any third party shall notify any Party (the "<u>Indemnified Party</u>") with respect to any matter (a "<u>Third Party Claim</u>") which may give rise to a claim for indemnification against any other Party (the "<u>Indemnifying Party</u>") under this §8, then the Indemnified Party shall promptly (and in any event within five (5) business days after receiving notice of the Third Party Claim) notify each of the Indemnifying Party thereof in writing.

    (ii) Any Indemnifying Party will have the right at any time to assume and thereafter conduct the defense of the Third Party Claim with counsel of his or its choice.

    (iii) Unless and until an Indemnifying Party assumes the defense of the Third Party Claim as provided in §8(d)(ii) above, however, the Indemnified Party may defend against the Third Party Claim in any manner he or it reasonably may deem appropriate.

    (iv) In no event will the Indemnified Party consent to the entry of any judgment or enter into any settlement with respect to the Third Party Claim without the prior written consent of each of the Indemnifying Parties.

  (e) <u>Determination of Adverse Consequences</u>. The Parties shall make appropriate adjustments for tax benefits and insurance coverage in determining Adverse Consequences for purposes of this §8. All indemnification payments under this §8 shall be deemed adjustments to the Purchase Price.

  (f) <u>Exclusive Remedy</u>. The Buyer and the Seller acknowledge and agree that the foregoing indemnification provisions in this §8 shall be the exclusive remedy of the Buyer and the Seller with respect to the Target, its Subsidiaries, and the transactions contemplated by this Agreement. Without limiting the generality of the foregoing, the Buyer acknowledges and agrees that it shall not have any remedy after the Closing for any breach of the representations and warranties in §4 above.

  (g) <u>Environmental Remedies</u>. Without limiting the generality of (f), above, the Buyer hereby waives any right, whether arising at law or in equity, to seek contribution, cost recovery, damages, or any other recourse or remedy from the Seller, and hereby releases the Seller, from any claim, demand or liability, with respect to any environmental, health, or safety matter relating to the past, current or future facilities, properties or operations of the Target, its Subsidiaries, and all of their respective predecessors or Affiliates, including without limitation any such matter

arising under any Environmental, Health, and Safety Requirements and including, without limitation, any arising under the Comprehensive Environmental Response, Compensation, and Liability Act ("CERCLA"), any analogous state law, or the common law. The Buyer hereby unconditionally agrees to indemnify, defend, and hold harmless the Seller from any and all liability, loss, cost or expense with respect to any such environmental, health, or safety matter (including any arising under any Environmental, Health, and Safety Requirements and including, without limitation, CERCLA, any analogous state law, or the common law).

9.    Miscellaneous.

(a)    Press Releases and Public Announcements. No Party shall issue any press release or make any public announcement relating to the subject matter of this Agreement [prior to the Closing] without the prior written approval of the Buyer and the Seller; provided, however, that any Party may make any public disclosure it believes in good faith is required by applicable law or any listing or trading agreement concerning its publicly-traded securities (in which case the disclosing Party will use its [reasonable] best efforts to advise the other Parties prior to making the disclosure).

(b)    No Third-Party Beneficiaries. This Agreement shall not confer any rights or remedies upon any Person other than the Parties and their respective successors and permitted assigns.

(c)    Entire Agreement. This Agreement (including the documents referred to herein) constitutes the entire agreement among the Parties and supersedes any prior understandings, agreements, or representations by or among the Parties, written or oral, to the extent they have related in any way to the subject matter hereof.

(d)    Succession and Assignment. This Agreement shall be binding upon and inure to the benefit of the Parties named herein and their respective successors and permitted assigns. No Party may assign either this Agreement or any of his or its rights, interests, or obligations hereunder without the prior written approval of the Buyer and the Seller.

(e)    Counterparts. This Agreement may be executed in one or more counterparts, each of which shall be deemed an original but all of which together will constitute one and the same instrument.

(f)    Headings. The section headings contained in this Agreement are inserted for convenience only and shall not affect in any way the meaning or interpretation of this Agreement.

(g)    Notices. All notices, requests, demands, claims, and other communications hereunder will be in writing. Any notice, request, demand, claim, or other communication hereunder shall be deemed duly given if (and then two business days after) it is sent by registered or certified

mail, return receipt requested, postage prepaid, and addressed to the intended recipient as set forth below:

<div style="margin-left:2em">

If to the Seller:    Sports Shinko (Hawaii) Co., Ltd.
          175 Paoakalani Avenue
          Honolulu, Hawaii
          Attn: Satoshi Kinoshita

   Copy to:    McCorriston Miller Mukai MacKinnon
          P.O. Box 2800
          Honolulu, Hawaii
          Attn: Franklin K. Mukai, Esq.

If to the Buyer:

   Copy to:

</div>

Any Party may send any notice, request, demand, claim, or other communication hereunder to the intended recipient at the address set forth above using any other means (including personal delivery, expedited courier, messenger service, telecopy, telex, ordinary mail, or electronic mail), but no such notice, request, demand, claim, or other communication shall be deemed to have been duly given unless and until it actually is received by the intended recipient. Any Party may change the address to which notices, requests, demands, claims, and other communications hereunder are to be delivered by giving the other Parties notice in the manner herein set forth.

(h) <u>Governing Law</u>. This Agreement shall be governed by and construed in accordance with the domestic laws of the State of Hawaii without giving effect to any choice or conflict of law provision or rule that would cause the application of the laws of any jurisdiction other than the State of Hawaii.

(i) <u>Amendments and Waivers</u>. No amendment of any provision of this Agreement shall be valid unless the same shall be in writing and signed by the Buyer and the Seller. No waiver by any Party of any default, misrepresentation, or breach of warranty or covenant hereunder, whether intentional or not, shall be deemed to extend to any prior or subsequent default, misrepresentation, or breach of warranty or covenant hereunder or affect in any way any rights arising by virtue of any prior or subsequent such occurrence.

(j) <u>Severability</u>. Any term or provision of this Agreement that is invalid or unenforceable in any situation in any jurisdiction shall not affect the validity or enforceability of the remaining terms and provisions hereof or the validity or enforceability of the offending term or provision in any other situation or in any other jurisdiction.

(k)  <u>Expenses</u>.  Each of the Buyer, the Seller, the Target, and the Target's Subsidiaries will bear his or its own costs and expenses (including legal fees and expenses) incurred in connection with this Agreement and the transactions contemplated hereby; <u>provided</u>, <u>however</u>, that the Buyer will also bear all of the costs and expenses of the Seller, the Target, and the Target's Subsidiaries (including all of their legal fees and expenses) incurred in connection with this Agreement and the transactions contemplated hereby (other than any Income Tax on any gain resulting from the sale of the Target Shares hereunder) in the event that the transactions contemplated by this Agreement are consummated. Without limiting the generality of the foregoing, all transfer, documentary, sales, use, stamp, registration and other such Taxes, and all conveyance fees, recording charges and other fees and charges (including any penalties and interest) incurred in connection with the consummation of the transactions contemplated by this Agreement, shall be paid by the Buyer when due, and the Buyer will, at its own expense, file all necessary Tax Returns and other documentation with respect to all such Taxes, fees and charges, and, if required by applicable law, the Parties will, and will cause their affiliates to, join in the execution of any such Tax Returns and other documentation.

(l)  <u>Construction</u>.  The Parties have participated jointly in the negotiation and drafting of this Agreement.  In the event an ambiguity or question of intent or interpretation arises, this Agreement shall be construed as if drafted jointly by the Parties and no presumption or burden of proof shall arise favoring or disfavoring any Party by virtue of the authorship of any of the provisions of this Agreement.  Any reference to any federal, state, local, or foreign statute or law shall be deemed also to refer to all rules and regulations promulgated thereunder, unless the context requires otherwise.  The word "including" shall mean including without limitation.

(m)  <u>Incorporation of Exhibits, Annexes, and Schedules</u>.  The Exhibits, Annexes, and Schedules identified in this Agreement are incorporated herein by reference and made a part hereof.

*****

[Signatures on the following page.]

IN WITNESS WHEREOF, the Parties hereto have executed this Agreement as of the date first above written.

[BUYER]

By:      _____

Title:   _____


[SELLER # 1 (an entity)]

By:      _____

Title:   _____


[SELLER # 2 (an entity)]

By:      _____

Title:   _____


_____

[SELLER # 3 (an individual)]